## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAROL A. TRAWICK | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| | )   Civil Action No. 08-43 (GMS) |
| v. | ) |
| | ) |
| T&A HOLDING CORPORATION, | ) |
| MT HOLDING CORPORATION | ) |
| | ) |
|     Defendants/Counterclaimants. | ) |
| | ) |

### PLAINTIFF CAROL A. TRAWICK'S OPENING BRIEF
### IN SUPPORT OF HER MOTION TO DISMISS
### DEFENDANTS' COUNTERCLAIM

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/* Jeremy D. Anderson
Kevin F. Brady (I.D. #2248)
Jeremy D. Anderson (I.D. #4515)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
kbrady@cblh.com
janderson@cblh.com

OF COUNSEL:
Stanley J. Reed
LERCH, EARLY & BREWER, CHTD.
3 Bethesda Metro Center
Suite 460
Bethesda, MD 20814
Tel: (301) 986-1300
sjreed@lerchearly.com

*Attorneys for Plaintiff Carol A. Trawick*

Dated: May 19, 2008

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| TABLE OF AUTHORITIES | | | ii |
| NATURE AND STAGE OF THIS PROCEEDING | | | 1 |
| SUMMARY OF THE ARGUMENT | | | 2 |
| STATEMENT OF FACTS | | | 2 |
| ARGUMENT | | | 5 |
| | A. | Standard Applicable To Motion To Dismiss | 5 |
| | B. | Applicable Law | 6 |
| | C | Count I of The Counterclaim, Breach of Contract, Fails To State A Claim For Relief And Should Be Dismissed | 6 |
| | D. | Count II of the Counterclaim, Breach of Implied Covenant of Good Faith And Fair Dealing, Fails To State a Claim For Relief And Should Be Dismissed | 12 |
| CONCLUSION | | | 13 |

# TABLE OF AUTHORITIES

## Cases

*Acme Supply Co. v. City of New York*,
   834 N.Y.S. 2d 142 (2007) ............................................................................................. 9

*Allegheny Gen. Hosp. v. Phillip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) ......................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
   127 S.Ct. 1955, 1964-65 (2007) ................................................................................... 5

*Broder v. Cablevisions Systems Corp.*,
   418 F.3d 187 (2d Cir. 2005) ....................................................................................... 12

*Cerberus International, Ltd. v. Banctec, Inc.*,
   791 N.Y.S.2d 28 (N.Y. App. Div. 2005) ..................................................................... 12

*Corhill Corp. v. S.D. Plants, Inc.*,
   217 N.Y.S.2d 595 (1961) .............................................................................................. 9

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ....................................................................................................... 6

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ..................................................................................................... 6

*Grazioli v. Encompass Ins. Co.*,
   835 N.Y.S.2d 682 (N.Y. App. Div. 2007) ................................................................... 12

*In re Burlington Coat Factories Security Litigation*,
   114 F.3d 1410 (3d Cir. 1997) ....................................................................................... 3

*In re SHC, Inc.*,
   329 B.R. 438 (Bankr. D. Del. 2005) ............................................................................. 2

*Jacobs Private Property, LLC v. 450 Park LLC*,
   803 N.Y.S.2d 14 (N.Y. App. Div. 2005) ..................................................................... 12

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) ............................................................................................. 5

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997) .................................................................................... 5, 11

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ....................................................................................... 2

*Pfeiffer v. Price*,
   2004 WL 3119780 (D. Del. Dec. 27, 2004) ................................................................. 3

*Ruttenberg v. Davidge Data Sys. Corp.*,
   626 N.Y.S.2d 174 (1995) .............................................................................................. 9

*Smith v. Delaware First Fed. Credit Union*,
   395 F.Supp.2d 127 (D. Del. 2005) ............................................................................... 5

*Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,*
   40 F.Supp.2d 644 (W.D. Pa. 1999)............................................................................. 2

*Swierkiewicz v. Sorema N.A.,*
   534 U.S. 506 (2002)............................................................................................... 6

*Thyroff v. Nationwide Mut. Ins. Co.,*
   460 F.3d 400 (2d Cir. 2006) ................................................................................... 12

*Tigue v. Commercial Life Ins. Co.,*
   631 N.Y.S.2d 974 (1995)........................................................................................ 9

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.,*
   1 N.Y.3d 470 (N.Y. 2004) ...................................................................................... 12

## NATURE AND STAGE OF THIS PROCEEDING

This action began on January 23, 2008 with the filing of a Complaint by Plaintiff Carol A. Trawick ("Plaintiff"), individually as a Seller, and as the designated Sellers Representative of the other sellers and stockholders of T. R. Systems, Inc., a Maryland Corporation, d/b/a Trawick & Associates ("T.R. Systems") for Breach of Contract against Defendants T&A Holding Corporaton ("T&A Holding") and MT Holding Corporation ("MT Holding", collectively "Defendants"). Docket Item "D.I." 1.    In brief, the Complaint alleges that Defendant T&A Holding[1] failed to make two required post-closing payments totaling $5,521,086.00 due on November 3, 2007 under the Stock Purchase Agreement.    Complaint ¶¶ 14, 15.    The Complaint further alleges that the payments represented certain adjustments and required future payments due to Sellers as set forth in the Stock Purchase Agreement in Sections 2.2 and 2.3(b), respectively, as the sum of the Initial Holdback Amount ($2,021,086.00) and the Earn-Out Payment ($3,500,000.00). *Id.*

On April 14, 2008, Defendants filed their Answer and brought a Counterclaim against Plaintiff for breach of the same Agreement that is the basis of the Complaint, and for breach of an alleged implied covenant of good faith and fair dealing. D.I. 6.

This is Plaintiff's Opening Brief in Support of Her Motion to Dismiss Defendants' Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]

---

[1] T&A Holding was the contracting party under the Stock Purchase Agreement with Plaintiff and the other Sellers. D.I. 1 ¶7. T&A Holding later merged into MT Holding on or about December 21, 2007 and Defendant MT Holding is the successor in interest to T&A Holding. D.I. 1 ¶¶ 5, 6; D.I. 6 ¶2.

[2] For simplicity, the term "Defendants" includes the term "Counterclaimants".

1

## SUMMARY OF THE ARGUMENT

1.    Count I of the Counterclaim, Breach of Contract, is directly barred by the plain language of Section 4.8 of the Stock Purchase Agreement, which contains the direct acknowledgment of Defendants that Sellers did not make and were not required to make any forward-looking statements regarding future revenue or financial performance of the Company; and

2.    Count II of the Counterclaim, Breach of Implied Covenant Of Good Faith and Fair Dealing, is also barred as New York law, which applies here, does not recognize a separate cause of action for breach of implied duty of good faith and fair dealing. Instead, such claims are treated as duplicative and part of a breach of contract claim. Moreover, since the implied covenant Defendants have alleged does not arise from an existing duty in the underlying Agreement, and is in fact contrary to the provisions of Section 4.8 of that Agreement, no claim for breach of implied covenant of good faith and fair dealing can be stated by Defendants. Again, Section 4.8 of the Stock Purchase Agreement controls and bars Defendants' claim.

## STATEMENT OF FACTS

The contract at issue in this case is the August 28, 2006 Stock Purchase Agreement[3] (the "Agreement", attached hereto as Exhibit "Ex." A) for the sale, by

---

[3] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "may properly consider a concededly authentic document upon which the complaint is based when the defendant attaches such a document to its motion to dismiss." *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *In re SHC, Inc.*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) ("The Court may consider documents which are incorporated into the complaint … even if they contradict the allegations."); *ESI, Inc. v. Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 497 (S.D.N.Y. 1998) ("[i]f the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint."); *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 649 (W.D. Pa. 1999) ("In the event of a factual discrepancy between the pleading

Plaintiff and the other stockholders of T.R. Systems, of all of the outstanding shares of T.R. Systems common stock to Defendant T&A Holding for a base purchase price of $42,500,000.00, plus certain adjustments and future earn-out and other payments all as set forth in the Agreement. D.I. 1 ¶ 7; D.I. 6 ¶ 6; Ex. A ¶ 2. At the time of the sale, T.R. Systems was a government contractor providing professional services under certain government contracts, including a contract with the United States Patent and Trademark Office ("the PTO Contract"). D.I. 6 ¶¶ 7, 8. The Agreement was the product of comprehensive negotiations between the parties, each of which was represented by sophisticated corporate counsel. Ex. A. 25.

In their Counterclaim, Defendants allege that nonpayment of the amounts claimed by Plaintiff was justified as a setoff under Sections 2.2(d) and 2.3(b)(i) of the Agreement due to an alleged breach of that Agreement by Plaintiff. D.I. 6 ¶ 18. The Counterclaim alleges that Plaintiff breached the Agreement by failing to inform Defendants of a future rule change by the Small Business Administration ("SBA") that occurred "12 days *after* the Closing". *Id.* at ¶¶ 11-14 (emphasis added). The Counterclaim alleges that the parties closed on the Agreement on November 3, 2006, and that "[m]erely 12 days *after* the Closing, the Small Business Administration issued a final rule amending, among other things, its size recertification regulations in a manner which materially and adversely impacted the PTO Contract." *Id.* at ¶ 11.

---

and the attached exhibit, the exhibit controls.") (citations omitted). Such document will not convert the motion to dismiss into one for summary judgment. *In re Burlington Coat Factories Security Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pfeiffer v. Price*, 2004 WL 3119780, at *2 (D. Del. Dec. 27, 2004) (recognizing that documents referred to in a complaint may be referenced without converting a motion to dismiss into one for summary judgment).

3

Defendants allege that the rule change altered the frequency of the SBA's size recertification regulations "in a manner which materially and adversely impacted the PTO Contract." *Id.* The Counterclaim further alleges:

> "Under the SBA's new rules, for contracts of more than five years' duration, such as the PTO Contract, initial size certification continues for a maximum of five years. Thereafter size "recertification" is required. As a result of Holding Companies' acquisition of TR Systems, Holding Companies will no longer qualify as a small business."

*Id.* at ¶ 12. Defendants further allege that "The loss of the PTO Contract will have a material, adverse impact upon Holding Companies' financial prospects and renders the company formerly know [sic] as TR Systems far less valuable than the over $40 million for which it was purchased." *Id.* at ¶ 14.

Based on the foregoing factual allegations, Defendants' Counterclaim sets forth two separate counts. Count I, Breach of Contract, alleges breach of the Agreement by Plaintiff for failing to inform Defendants of a future SBA rule change, which Defendants allege is a breach of Sections 3.13, 3.25 and 3.34 of the Agreement. *Id.* at ¶¶ 23-27. In Count II, Breach of Implied Covenant of Good Faith And Fair Dealing, Defendants allege that "[t]hrough her execution of the Stock Purchase Agreement, Trawick owed a duty of good faith and fair dealing to Holding Companies". *Id.* at ¶ 29. Defendants further allege that "Trawick breached the duty of good faith and fair dealing owed to Holding Companies by failing to disclose material information to Holding Companies in a timely or reasonable manner, by providing Holding Companies with misleading and/or inaccurate information, including information relating to the continuation of the PTO Contract, by failing so satisfy the covenants and obligations under the Stock Purchase Agreement, by failing to cure or rectify in any reasonably [sic] manner its material breach

4

of contract upon written notice from Holding Companies, and by participating in other acts demonstrating bad faith toward Holding Companies." *Id.* at ¶ 30.

## ARGUMENT

### A.    Standard Applicable To Motion To Dismiss

The purpose of a motion to dismiss is to test the sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993). As such, the court must accept all facts alleged in the complaint as true and draw all reasonable conclusions arising from those facts in favor of the Plaintiffs. *Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 434-35 (3d Cir. 2000); *Smith v. Delaware First Fed. Credit Union,* 395 F. Supp. 2d 127, 129 (D. Del. 2005).

While a complaint need not include detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1964-65 (2007) (citations and internal quotations omitted). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted).

Although the Court will accept all well-pled allegations as true for the purposes of deciding a motion under Federal Rule of Civil Procedure 12(b)(6), it is equally clear that the Court should grant the motion if "it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted). Moreover, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to

dismiss." *Id*. Under Federal Rule of Civil Procedure 8(a)(2), a complaint must both (a) give the defendant fair notice of a plaintiff's claim; and (b) state the grounds upon which the claim rests. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

### B.    Applicable Law

Under the principles stated in *Erie Railraod v. Tompkins*, federal courts sitting in diversity apply state substantive law and federal procedural law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938); *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427 (1996). Where the matter in question is one covered by the Federal Rules of Civil Procedure, "it is settled that... the Federal Rule applies regardless of contrary state law." *Id.* at 427 n.7.

By agreement of the parties, the state substantive law applicable to the contract claims stated in the Complaint and Counterclaim is the law of the State of New York. The Agreement contains a choice of law clause which provides that the Agreement is to be "construed and governed by the laws of the State of New York." Ex. A ¶ 23.

### C.    Count I of the Counterclaim, Breach of Contract, Fails To State a Claim For Relief And Should Be Dismissed.

Defendants' Counterclaim rests on a single key factual allegation: that Plaintiff failed, prior to Closing of the purchase of T.R. Systems on November 3, 2006, to inform Defendants that "[m]erely twelve days *after* the Closing, the Small Business Administration issued a final rule amending, among other things, its size recertification regulations in a manner which materially and adversely affected the PTO Contract." D.I. 6 ¶ 11 (emphasis added). Defendants further allege - purely on information and belief and without any actual factual allegations or specific factual support - that "Upon information and belief, Trawick knew of the impending SBA rule change prior to the

6

Agreement's Closing Date." *Id.* at ¶ 15.    Finally, Defendants allege that "[t]he loss of the PTO Contract will have a material, adverse impact upon Holding Companies' financial prospects and renders the company formerly know [sic] as TR Systems far less valuable than the over $40 million for which it was purchased." *Id.* at ¶ 14.

In their Counterclaim, Defendants conveniently ignore Section 4.8 of the Agreement, which in plain terms refutes and bars the substance of Defendants' Counterclaim in its entirety.  It provides:

> 4.8    Buyer's Acknowledgement Regarding Forward-Looking Statements. Buyer acknowledge that (a) neither Company nor the Sellers nor any of Company's Representatives makes or shall be deemed to have made hereunder any representations or warranties, express or implied, at law or in equity, of any kind or nature whatsoever concerning or as to the accuracy or completeness of any projections, budgets, forecasts or other forward-looking financial information concerning the future revenue, income, profit or other financial results of Company, (b) there are uncertainties inherent in attempting to make any such projections, budgets, forecasts or other forward-looking financial information, and (c) actual results of operations may differ materially from any such projections, budgets, forecasts or other forward-looking financial information.

Defendants do not allege that Plaintiff had a crystal ball that allowed her to see twelve days into the future after Closing, but even if they had made such an allegation it would not save their claim given the plain language of Section 4.8, above.  Not only does Section 4.8 contain the parties' agreement that no representations have been made, express or implied, *"of any kind or nature whatsoever as to the accuracy or completeness of any projections, budgets, forecasts or other forward-looking financial information concerning the future revenue income, profit or other financial results of the Company"*, it also contains the Defendants' – as Buyers - express *acknowledgement*  of the uncertainties of any such forward looking financial information as the agreed rationale for the Parties' agreement to include Section 4.8 within the terms of the Agreement.

Indeed, the very title of the Section, *"Buyers Acknowledgement Regarding Forward Looking Statements"*, reinforces the importance of this provision by not only including the provision in the Agreement but also by providing both in title and in substance the Defendants' acknowledgement, as Buyers, that the Sellers, including Plaintiff, did not "make or shall be deemed to have made" any, representations, warranties, budgets, forecasts or other forward-looking financial information concerning "the future revenue, income, profit or other financial results of the Company".

The essence of Defendants' Counterclaim is that Plaintiff should have made a forward-looking statement regarding the future revenue of T.R. Systems based on a future rule change by the SBA, contrary to the plain language of Section 4.8 of the Agreement that no such statement was made or was required to be made.  Defendants' attempt to rewrite Section 4.8 or pretend that it is not part of the Agreement should be rejected by the Court.   Section 4.8 was not a surprise to Defendants, who were represented by Counsel at all times in connection with the negotiation and preparation of the Agreement. Ex. A ¶ 25.  Further, Defendants had plenty of time to consider and understand the importance of all aspects of the Agreement, including Section 4.8.  The parties entered into the Agreement, including Section 4.8, on August 28, 2006.  D.I. 6 ¶ 6.  Closing under the Agreement took place 68 days later, on November 3, 2006.  *Id.* at ¶ 11.  The SBA issued its final rule twelve days later, i.e., on November 15, 2006.  *Id.* By Defendant's own admission, the SBA final rule was not enacted until twelve days *after* Closing.

Under New York law, where, as here, the language of a contract is clear and unambiguous, interpretation of that contract and construction of its provisions are

8

questions of law for the court, and the court must ascertain the intent of the parties from the plain meaning of the language employed, giving terms their plain, ordinary, popular and non-technical meanings. *Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974, 975 (1995) (citations omitted).

Defendants' artful pleading and attempt to conjure claims for their Counterclaim would require that this Court ignore the plain language and effect of Section 4.8 of the Agreement. In *Acme Supply Co. v. City of New York,* 834 N.Y.S. 2d 142 (2007), the court noted the well-established rule of contract interpretation that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect. *Id.* at 143, citing *Corhill Corp. v. S.D. Plants, Inc.,* 217 N.Y.S.2d 595, 599 (1961). And, an interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation. *Id.,* citing *Ruttenberg v. Davidge Data Sys. Corp.,* 626 N.Y.S.2d 174 (1995).

In the Counterclaim, Defendants mischaracterize Section 3.25 of the Agreement in an attempt to bolster their claim of breach of contract, stating "[t]he Agreement also contains a provision, Section 3.25, acknowledging that neither party has provided untrue statements of material fact, or omitted any material facts, in connection with this transaction." D.I. 6 ¶ 20. In fact, Section 3.25 contains no such general or blanket statement as alleged by Defendants. Instead, it is specifically limited to disclosure which the Sellers have actually agreed to make under the Agreement. Section 3.25 provides:

> 3.25   Disclosure. No representations or warranties by Company or the Sellers set forth in this Agreement (including, without limitation, the Disclosure Schedules hereto), the Transaction Documents, or in any document, exhibit, statement, certificate or schedule which is furnished or to be furnished by Company pursuant to Section 9 in connection with the Closing of the transactions herein contemplated (1) contains or will contain any untrue statement of a

9

material fact, or (ii) omits or will omit to state, when read in conjunction with all of the information contained in this Agreement, the Disclosure Schedules hereto and the other Transaction Documents, any material fact necessary to make the statements of facts contained therein not misleading.[4]

Section 3.25 neither limits the effect of Section 4.8 nor does it create new duties that are otherwise circumscribed by Section 4.8. Section 3 of the Agreement is entitled "Representations And Warranties of Company and the Sellers", and lists the various representations and warranties which are actually made by Plaintiff and the Seller in the Agreement. However, what is not contained in the list of representations and warranties made by the Sellers is any forward-looking financial statement or representation of any form or nature regarding the future revenue of T.R. Systems, as the parties expressly agreed in Section 4.8 that no such statement was made or could reliably be made by Plaintiff or the Sellers.

In a further attempt to conjure claims where none exist, Defendants quote only a portion of Section 3.34 of the Agreement in ¶ 21 of the Counterclaim, omitting the operative dates of that section. Defendants alleged:

> "Section 3.34 of the Agreement is titled 'Absence of Changes' and represents that 'except for matters of general knowledge in the industry related to general economic or industry conditions, there has not been any change or development with respect to Company's business, operations, condition (financial or otherwise), results of operations, assets or liabilities.'"

In fact, by its terms, Section 3.34 is a representation made only as of the date of Closing and covers the time period from June 1, 2006 to the date of the Agreement, August 28, 2006. It provides:

---

[4] Section 9 of the Agreement contains a list of Closing Documents to be delivered by Company and the Sellers (9.1). Conspicuously absent from the list is any reference to any document even remotely connected to the future rulemaking actions of the SBA or forward-looking statements regarding the effect of any such rulemaking on the future revenue of T.R. Systems.

3.34    Absence of Changes.  Except as set forth in Schedule 3.34, since June 1, 2006, (i) Company has conducted its business only in the ordinary and usual course of business consistent with past practice, and (ii) except for matters of general knowledge in the industry related to general economic or industry conditions, there has not been any change in or development with respect to Company's business, operations, condition (financial or otherwise), results of operations, assets or liabilities, except for changes and developments which have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Both Sections 3.25 and 3.24 must also be read in conjunction with the Defendants' acknowledgement in Section 4.8 that no "forward-looking" statements regarding the "future revenue, income, profit or other financial results" of T.R. Systems have been made or "shall be deemed to have been made" by Plaintiff and the Sellers.  When all relevant portions of the Agreement are considered, it becomes quite clear that Defendants' mischaracterization of Sections 3.25 and 3.24, and attempt to interpret those sections in a way that would render Section 4.8 to be void and of no effect, must fail as contrary to well-established rules of contract construction under New York law.

Finally, Defendants have attempted to support their claims with the additional unsubstantiated allegation that "*Upon information and belief,* Trawick knew of the impending rule change prior to the Agreement's Closing Date".  D.I. 6 ¶ 15. That is precisely the sort of "bald assertion" which the Court is not required to credit when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).   No facts are alleged to support this "information and belief" allegation, nor, Plaintiff submits, could any such facts be stated.  Suffice it to say that the SBA's well-documented and public rulemaking procedures do not include clearing their actions in advance with the Plaintiff before official enactment of final rules by the SBA.

11

> **D.     Count II of the Counterclaim, Breach of Implied Covenant of Good Faith And Fair Dealing, Fails To State a Claim for Relief And Should Be Dismissed.**

This Court should also dismiss Count II of the Counterclaim, Breach of Implied Covenant Of Good Faith and Fair Dealing, as it fails to state a claim upon which relief can be granted.

First, New York law does not recognize a separate cause of action for breach of the implied duty of good faith and fair dealing. Accordingly, the courts generally dismiss such a claim on the grounds that it is duplicative of the claim for breach of contract. *See Grazioli v. Encompass Ins. Co.*, 835 N.Y.S.2d 682, 683-684 (N.Y. App. Div. 2007); *Cerberus International, Ltd. v. Banctec, Inc.*, 791 N.Y.S.2d 28, 30 (N.Y. App. Div. 2005); *Jacobs Private Property, LLC v. 450 Park LLC*, 803 N.Y.S.2d 14, 15 (N.Y. App. Div. 2005).

Second, New York courts will recognize an implied covenant only if its promise is so interwoven into the contract that it is necessary to effectuate the contract's purpose, particularly in the face of conduct that threatens to violate otherwise presumed obligations. *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). Furthermore, an implied covenant can only impose obligations that are consistent with other mutually agreed upon terms in the contract, and can never add substantive provisions unintended by the contracting parties. *Broder v. Cablevisions Systems Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005). And, under New York law a court should not interpret an agreement to impliedly contain provisions that are not specifically stated. *Vermont Teddy Bear Co. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 475 (N.Y. 2004).

12

In Count II of the Counterclaim, Defendants have alleged the existence of an implied covenant or condition which is directly contrary to the provisions of Section 4.8 of the Agreement, which contains Defendants' acknowledgement that no "forward-looking" statements regarding the "future revenue, income, profit or other financial results" of T.R. Systems have been made or "shall be deemed to have been made" by Plaintiff and the Sellers.

New York Law does not permit this Court to rewrite the Agreement to impose implied duties upon Plaintiff which Section 4.8 specifically and expressly eliminates. Instead, Count II should be recognized for what it is, an ill-founded attempt to contrive a claim where none exists, and should be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant its Motion to Dismiss Defendants' Counterclaim in its entirety.

CONNOLLY BOVE LODGE & HUTZ LLP

/s/ Jeremy D. Anderson
Kevin F. Brady (I.D. #2248)
Jeremy D. Anderson (I.D. #4515)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel:    (302) 658-9141
kbrady@cblh.com
janderson@cblh.com

OF COUNSEL:
Stanley J. Reed
LERCH, EARLY & BREWER, CHTD.
3 Bethesda Metro Center
Suite 460
Bethesda, MD 20814
Tel: (301) 986-1300
sjreed@lerchearly.com

*Attorneys for Plaintiff Carol A. Trawick*

Dated: May 19, 2008

13

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2008, the foregoing PLAINTIFF CAROL A. TRAWICK'S OPENING BRIEF IN SUPPORT OF HER MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following and the document is available for reviewing and downloading from CM/ECF:

> Stephen C. Norman, Esquire (#2686)
> Sarah E. DiLuzio, Esquire (#4085)
> Potter Anderson & Corroon LLP
> 1313 N. Market Street
> P. O. Box 951
> Wilmington, DE  19801
> snorman@potteranderson.com
> sdiluzio@potteranderson.com

> /s/ Jeremy D. Anderson
> Jeremy D. Anderson (#4515)

14

# EXHIBIT A

# PART 1

Execution Copy

STOCK PURCHASE AGREEMENT

by and among

T.R. SYSTEMS, INC.
d/b/a
TRAWICK & ASSOCIATES

THE SHAREHOLDERS OF

T.R. SYSTEMS, INC.

T&A HOLDING CORP.

and

THE VERITAS CAPITAL FUND II, L.P.

Dated:  as of August 28, 2006

10176897.8

# TABLE OF CONTENTS

Page

1.  DEFINITIONS ................................................................................................1

2.  PURCHASE PRICE, CLOSING BALANCE SHEET AND INITIAL
    HOLDBACK ...............................................................................................10

    2.1  Purchase and Sale of the Stock ........................................................ 10
    2.2  Payment of Base Purchase Price; Purchase Price Adjustments; Initial Holdback
         Amount ............................................................................................ 10
    2.3  Earn-Out Payments. ......................................................................... 13
    2.4  Payments On or Before Closing ....................................................... 15
    2.5  Form of Payments ............................................................................ 16
    2.6  Excluded Assets ............................................................................... 16

3.  REPRESENTATIONS AND WARRANTIES OF COMPANY AND
    THE SELLERS ..........................................................................................16

    3.1  Organization .................................................................................... 16
    3.2  Authorization; Corporate Documentation ......................................... 16
    3.3  Title to the Stock; Subsidiaries ....................................................... 17
    3.4  Capitalization ................................................................................... 17
    3.5  Binding Agreement ........................................................................... 17
    3.6  No Breach ......................................................................................... 18
    3.7  Permits ............................................................................................. 18
    3.8  Compliance With Laws ..................................................................... 18
    3.9  Title to and Sufficiency of Assets .................................................... 19
    3.10 Condition of Personal Property ........................................................ 19
    3.11 Accounts Receivable ........................................................................ 19
    3.12 Intellectual Property; No Infringement ............................................. 19
    3.13 Contracts .......................................................................................... 20
    3.14 Litigation .......................................................................................... 21
    3.15 Financial Statements; EBITDA ........................................................ 21
    3.16 Liabilities ......................................................................................... 22
    3.17 Tax Matters ...................................................................................... 22
    3.18 Insolvency Proceedings .................................................................... 23
    3.19 Employee Benefit Plans .................................................................... 23
    3.20 Insurance .......................................................................................... 24
    3.21 Environmental Matters ..................................................................... 25
    3.22 Leases .............................................................................................. 26
    3.23 No Other Agreement To Sell ............................................................ 26
    3.24 Transactions with Certain Persons ................................................... 27
    3.25 Disclosure ........................................................................................ 27
    3.26 No Affiliates ..................................................................................... 27

3.27 Employees.................................................................................................. 27
3.28 No Suspension or Debarment .................................................................. 27
3.29 Government Audits.................................................................................... 27
3.30 Labor Relations........................................................................................ 28
3.31 Board Approval ........................................................................................ 28
3.32 Brokers...................................................................................................... 28
3.33 Government Contracts ............................................................................. 28
3.34 Absence of Changes ................................................................................ 29
3.35 No Additional Representations ............................................................... 30

4.    REPRESENTATIONS AND WARRANTIES OF BUYER ...............................30

4.1  Organization ............................................................................................ 30
4.2  Corporate Authorization ......................................................................... 30
4.3  Binding Agreement.................................................................................. 30
4.4  No Breach ................................................................................................. 30
4.5  Litigation; Compliance with Law .......................................................... 31
4.6  Solvency; Ability to Perform Agreement .............................................. 31
4.7  Investment Intent ..................................................................................... 31
4.8  Buyer's Acknowledgement Regarding Forward-Looking Statements ....................... 31
4.9  Brokers...................................................................................................... 31
4.10 Board Approval ........................................................................................ 31
4.11 No Additional Representations ............................................................... 31

5.    COVENANTS ....................................................................................................32

5.1  Affirmative Covenants of Company and the Sellers ............................. 32
5.2  Negative Covenants of Company and the Sellers.................................. 32
5.3  Adverse Developments ............................................................................ 35
5.4  Potential Breach....................................................................................... 35
5.5  Access ....................................................................................................... 35
5.6  Financial Statements ............................................................................... 35
5.7  No Negotiations ....................................................................................... 35
5.8  Confidentiality ......................................................................................... 36
5.9  No Inconsistent Action ............................................................................ 37
5.10 Permits ...................................................................................................... 37
5.11 HSR Act Matters...................................................................................... 37
5.12 Employees................................................................................................. 38
5.13 Further Action; Efforts ........................................................................... 38
5.14 Releases .................................................................................................... 39
5.15 Non-Competition Agreements................................................................ 39
5.16 Tax Returns............................................................................................... 39
5.17 Cooperation on Tax Matters ................................................................... 40
5.18 Indebtedness ............................................................................................ 42

6.   CONDITIONS TO BUYER'S OBLIGATIONS ............................................................42

    6.1   Representations and Warranties ........................................................... 42
    6.2   Compliance with Covenants ................................................................ 43
    6.3   Closing Documents .............................................................................. 43
    6.4   Receipt of Third Party Consents .......................................................... 43
    6.5   Governmental Consents, Approvals and Waivers ................................. 43
    6.6   Absence of Litigation .......................................................................... 43
    6.7   No Material Adverse Effect .................................................................. 43
    6.8   No Indebtedness; Release of Liens ...................................................... 43
    6.9   Execution of Non-Competition and Non-Disclosure Agreements ........... 44
    6.10  Excluded Assets .................................................................................. 44
    6.11  CSC Subcontract ................................................................................ 44
    6.12  Minimum EBITDA ............................................................................... 44

7.   CONDITIONS TO COMPANY'S AND SELLERS' OBLIGATIONS .........................44

    7.1   Representations and Warranties ........................................................... 44
    7.2   Compliance with Covenants ................................................................ 45
    7.3   Closing Documents .............................................................................. 45
    7.4   Governmental Consents and Waivers ................................................... 45
    7.5   Absence of Litigation .......................................................................... 45
    7.6   Payment ............................................................................................. 45

8.   CLOSING .........................................................................................................45

    8.1   Timing ................................................................................................ 45

9.   CLOSING DOCUMENTS ...................................................................................45

    9.1   Closing Documents to be Delivered by Company and the Sellers ........... 45
    9.2   Closing Documents to be Delivered by Buyer ....................................... 47
    9.3   Other Closing Documents .................................................................... 47

10.  TERMINATION; REMEDIES ..............................................................................47

    10.1  Termination ........................................................................................ 47
    10.2  Effect of Termination ........................................................................... 48
    10.3  Termination Due to Closing Promissory Note Non-Payment ................... 48
    10.4  Termination Fee .................................................................................. 49

11.  INDEMNIFICATION ..........................................................................................49

    11.1  Survival of Representations and Warranties .......................................... 49
    11.2  Indemnification by Company and the Sellers ........................................ 50
    11.3  Indemnification by Buyer ..................................................................... 50
    11.4  Procedures for Indemnification ............................................................ 51

11.5   Limitations on Indemnification ................................................................... 52
11.6   Subrogation..................................................................................................... 52
11.7   Exclusive Remedies........................................................................................ 53
11.8   No Double Recovery; Use of Insurance ......................................................... 53
11.9   Treatment of Indemnity Payments Between the Parties................................. 53
11.10 Mitigation ..................................................................................................... 53

**12.   POST CLOSING MATTERS**...................................................................**53**

12.1   Books and Records ......................................................................................... 53
12.2   Cooperation and Records Retention ............................................................... 54

**13.   EXPENSES**..............................................................................................**54**

**14.   FURTHER ASSURANCES**......................................................................**54**

**15.   AMENDMENT; BENEFIT AND ASSIGNABILITY** ...............................**54**

**16.   NOTICES** ................................................................................................**55**

**17.   WAIVER**..................................................................................................**56**

**18.   ENTIRE AGREEMENT**..........................................................................**56**

**19.   COUNTERPARTS** ..................................................................................**56**

**20.   CONSTRUCTION**...................................................................................**56**

**21.   EXHIBITS AND DISCLOSURE SCHEDULES** .....................................**57**

**22.   SEVERABILITY** ....................................................................................**57**

**23.   CHOICE OF LAW** ..................................................................................**57**

**24.   PUBLIC STATEMENTS** .........................................................................**57**

**25.   COUNSEL**...............................................................................................**57**

**26.   WAIVER OF TRIAL BY JURY** .............................................................**58**

**27.   SELLERS REPRESENTATIVE**..............................................................**58**

27.1   Appointment of Sellers Representative .......................................................... 58
27.2   Successor Sellers Representative..................................................................... 59
27.3   Sellers Representative Fund; Excess Expenses .............................................. 59
27.4   Standard of Care; Indemnity by Sellers.......................................................... 60

**Exhibits**

Exhibits A-1,
A-2 and A-3          Forms of Non-Competition Agreements

Exhibit B            Form of Closing Promissory Note


**Schedules**

Schedule 2.6         Excluded Assets

Schedule 3.1         Organization

Schedule 3.4         Capitalization

Schedule 3.6         No Breach; Third-Party Consents

Schedule 3.8         Compliance with Laws

Schedule 3.9         Assets; Liens

Schedule 3.10        Personal Property

Schedule 3.11        Accounts Receivable

Schedule 3.12        Intellectual Property; No Infringement

Schedule 3.13        Contracts

Schedule 3.14        Litigation

Schedule 3.15        Financial Statements; EBITDA

Schedule 3.16        Liabilities

Schedule 3.17        Tax Matters

Schedule 3.19        Employee Benefit Plans

Schedule 3.20        Insurance

Schedule 3.21        Environmental Matters

Schedule 3.22        Leases

Schedule 3.24        Transactions with Certain Persons

10176897.8

Schedule 3.26          Affiliates

Schedule 3.27          Employees

Schedule 3.28          Suspension or Debarment

Schedule 3.29          Government Audits

Schedule 3.30          Labor Relations

Schedule 3.33(a)       Government Contracts:  List of Government Contracts

Schedule 3.33(b)       Government Contracts:  No Breach

Schedule 3.33(c)       Government Contracts:  Investigations

Schedule 3.33(d)       Government Contracts:  Disputes

Schedule 3.34          Absence of Changes

Schedule 5.2           Negative Covenants of Company and the Sellers

Schedule 5.12          Bonus Payments

Schedule 6.9           Key Employees

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is entered into as of the 28th day of August, 2006, by and among T&A Holding Corp., a Delaware corporation ("Buyer"), T.R. Systems, Inc., a Maryland corporation d/b/a Trawick & Associates ("Company"), Carol A. Trawick, James R. Trawick, Mark E. Kleckner and Gary H. Brown (each a "Seller", and collectively the "Sellers"), and, solely for purposes of Section 10.4 of this Agreement, The Veritas Capital Fund II, L.P., a Delaware limited partnership ("Parent").

### RECITALS

A.    Company is engaged in the business of providing specialized network engineering, operations, maintenance, telecommunication and other information technology services to governmental and civilian customers, with its principal place of business in the State of Maryland.

B.    The Sellers collectively own all of the issued and outstanding shares of capital stock of Company, consisting of 100 shares of common stock, no par value (the "Stock").

C.    The Sellers desire to sell and convey the Stock to Buyer, and Buyer desires to purchase the Stock from Sellers, upon the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1.    DEFINITIONS**

As used in this Agreement, the following terms will have the respective meanings set forth below:

"Affiliate" means any Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such entity. The term "Control" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

"Assets" means all cash and cash equivalents, marketable securities and Personal Property of Company, all Contracts and Leases to which Company is a party, all Permits held by Company, all Company IP and all other assets of Company, except for the Excluded Assets.

"Base Purchase Price" shall have the meaning set forth in Section 2.1.

"Benefit Plans" shall have the meaning set forth in Section 3.19(a).

10176897.8

"Business" means the business conducted by Company on the date hereof and as of the Closing Date.

"Business IP" means the Company IP and the Licensed IP.

"Buyer" shall have the meaning set forth in the Preamble hereto.

"Buyer's Representatives" shall have the meaning set forth in Section 5.5.

"Cash" means, as of the date of determination, the difference of (a) the aggregate amount of cash and cash equivalents held as of 10:00 a.m. (New York City time) in the bank accounts, including money market accounts, of Company, minus (b) the aggregate balance of all outstanding checks written against such accounts.

"Closing" shall have the meaning set forth in Section 8.1(a).

"Closing Date" shall have the meaning set forth in Section 8.1(a).

"Closing Date Balance Sheet" shall have the meaning set forth in Section 2.2(c)(ii).

"Closing Date Net Working Capital" shall have the meaning set forth in Section 2.2(b).

"Closing Date Net Working Capital Statement" shall have the meaning set forth in Section 2.2(c)(ii).

"Closing Promissory Note" shall have the meaning set forth in Section 2.2(a).

"Closing Promissory Note Non-Payment" shall have the meaning set forth in Section 10.3.

"Closing Purchase Price Payment" shall have the meaning set forth in Section 2.2(a).

"COBRA" shall have the meaning set forth in Section 3.19(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in the Preamble hereto.

"Company IP" means all Intellectual Property owned by Company as of the date of this Agreement.

"Confidentiality Information" shall have the meaning set forth in Section 5.8(a).

"Contracts" means all contracts, agreements, commitments, understandings or obligations of any kind, whether written or oral (including any amendments and other modifications thereto), to which Company is a party or which are binding upon Company or the Assets, including, but not limited to, purchase, sale or other commitments, customer contracts, distributorship, franchise or similar agreements, patent or trademark licensing agreements (either as licensor or

10176897.8

2

licensee) or other agreements concerning Intellectual Property, lease or sublease agreements (either as lessor or lessee), equipment leases, employment agreements (including, but not limited to, agreements entered into by employees of Company relating to the transfer and/or safeguarding of Intellectual Property rights), consulting agreements and union or collective bargaining agreements, non-competition agreements, severance agreements, guarantees, loan agreements, letters of credit or other instrument relating to Indebtedness, joint venture or partnership agreements and supply or requirements contracts and (i) which are in effect on the date hereof, including, without limitation, those listed on Schedule 3.13 or Schedule 3.22, or (ii) which are entered into by Company between the date hereof and the Closing Date.

"CSC" means Computer Sciences Corporation, a Nevada corporation.

"CSC Accrued Expenses" means expenses accrued by Company as current liabilities, in accordance with GAAP and the accounting principles of Company, consistently applied, relating to services provided under the CSC Subcontract for which CSC has not rendered invoices or unpaid accounts payable relating to such services.

"CSC Related Accounts Receivable" means accounts receivable of Company arising from the FRCN Contract and relating to services provided by CSC under the CSC Subcontract.

"CSC Subcontract" means that certain subcontract # CSC-001-550 between Company and CSC under the FRCN Contract.

"Data" means all information and data, whether in printed or electronic form and whether contained in a database or otherwise.

"DCAA" shall mean the Defense Contract Audit Agency of the United States Government.

"Disclosure Schedules" means the disclosure schedules to this Agreement.

"EBITDA" means earnings of the Business from operations before interest, taxes, depreciation and amortization and excluding (1) extraordinary items, (2) all gains or losses in connection with sales or dispositions of assets and investments not in the ordinary course of business, (3) all cumulative effects of changes in accounting principles, (4) all compensation, benefits and other costs related to new hires by Company, other than personnel that is required to fulfill obligations and is billable under Government Contracts and other customer Contracts, (5) material expenses incurred by Company after the Closing Date that are not consistent with past practice and (6) any intercompany management and similar charges arising from Buyer, each as calculated in accordance with GAAP applied on a consistent basis, in effect as of December 31, 2005. The calculation of EBITDA shall not be revised for any changes in GAAP that became effective after December 31, 2005 and during the Earn-Out Period. The calculation of EBITDA shall also be adjusted, as appropriate, in accordance with Section 2.3 hereof. For the avoidance of doubt, investment banking fees, legal fees and other costs incurred by Company in connection with the transactions contemplated under this Agreement shall constitute extraordinary items as referred to in subparagraph (1) above.

10176897.8

3

"Earn-Out Payment" shall have the meaning set forth in <u>Section 2.3(a)</u> hereof.

"Earn-Out Period" shall have the meaning set forth in <u>Section 2.3(a)</u> hereof.

"Earn-Out Notice" shall have the meaning set forth in <u>Section 2.3(b)</u> hereof.

"Election" shall have the meaning set forth in <u>Section 5.17(d)</u>.

"Environmental Claim" means any complaint, summons, citation, notice, notice of violation, judicial or administrative proceeding, judgment, claim, action, cause of action, investigation, demand, letter, written request for information or written notice by any Governmental Authority or third party involving violations of Environmental Laws or Releases of Hazardous Substances from (i) any of the facilities of Company; (ii) from any adjoining properties or businesses; or (iii) from or onto any facilities which received Hazardous Materials generated by Company.

"Environmental Law" means any federal, state, or local law, ordinance, order, rule, rule of common law, or regulation relating to natural resources, pollution, protection of human health or the environment, or actual or threatened releases, discharges, or emissions into the environment or within structures.

"Environmental Losses" means any monetary obligations, losses, liabilities (including strict liability), damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable out-of-pocket fees, disbursements and expenses of counsel, out-of-pocket expert and consulting fees and out-of-pocket costs for environmental site assessments, remedial investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Claim filed by any Governmental Authority or any third party which relate to any violations of Environmental Laws, Remedial Actions, Releases or threatened Releases of Hazardous Materials from or onto any property presently or formerly owned, leased, operated or otherwise used by Company or a predecessor in interest, or (ii) any facility which received Hazardous Materials generated by Company or a predecessor in interest.

"ERISA" shall have the meaning set forth in <u>Section 3.8</u>.

"Excluded Assets" shall have the meaning set forth in <u>Section 2.6</u>.

"Final Closing Date Net Working Capital Statement" shall have the meaning set forth in <u>Section 2.2(c)(iv)</u>.

"Financial Statements" shall have the meaning set forth in <u>Section 3.15</u>.

"FRCN Contract" means that certain blanket purchase agreement # F05604-03-A-0002 between Company and the 21st Contracting Squadron relating to operation and maintenance services for the Front Range Consolidated Network.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America as consistently applied by Company.

"Government" means the government of the United States of America, its agencies and instrumentalities.

"Governmental Authority" means any federal, state, local, foreign or other governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Government Bid" means any offer to sell products or services made by Company to any Governmental Authority or any prime contractor prior to the Closing Date which, if accepted, would result in a Government Contract.

"Government Contract" means any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, pricing agreement, letter contract or other similar arrangement of any kind, between Company, on the one hand, and (i) any Governmental Authority, or (ii) any prime contractor of a Governmental Authority in its capacity as a prime contractor, on the other hand. A task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, for purposes of this definition, but shall be part of the Government Contract to which it relates.

"Gross-Up Amount" shall have the meaning set forth in Section 5.17(f).

"Hazardous Materials" means any substance, material, liquid or gas defined or designated as hazardous or toxic (or by any similar term) under any Environmental Law, or any other material regulated under any Environmental Law, including, without limitation, petroleum products and friable materials containing more than one percent (1.0%) asbestos by weight.

"HSR Act" shall have the meaning set forth in Section 3.6.

"Improvements" means all leasehold improvements and fixtures located on the Leased Premises.

"Indebtedness" means, with respect to any Person, (i) any indebtedness for borrowed money of such Person, (ii) any capital lease obligations or any other similar capital obligations of such Person, other than the capital leases listed on Schedule 3.9, (iii) any synthetic lease obligations or any other similar lease obligations of such Person, (iv) any obligations of such Person under any derivative agreements or any other similar agreements (including interest-rate, exchange-rate, commodity and equity-linked agreements), (v) any obligations of such Person in respect of off-balance-sheet agreements or transactions that are in the nature of, or in substitution of, financings, and (vi) any indebtedness or other obligations of any other Person of the type specified in any of the foregoing clauses, the payment or collection of which such Person has guaranteed or in respect of which such Person is liable, contingently or otherwise, including liable by way of agreement to purchase products or securities, to provide funds for payment, to

10176897.8

5

maintain working capital or other balance sheet conditions or otherwise to assure a creditor against loss.

"Indemnified Party" shall have the meaning set forth in Section 11.4(a).

"Indemnifying Party" shall have the meaning set forth in Section 11.4(a).

"Initial Holdback Amount" shall mean $2,000,000, which shall be held back by Buyer on the Closing Date pursuant to Section 2.2(d) as security and a source for effecting the payment and discharge of any indemnification obligations of the Sellers set forth in Section 11 hereof.

"Intellectual Property" means all of the following U.S., state and foreign intellectual property: (a) inventions, discoveries, processes, designs, techniques, developments, technology and related improvements, whether or not patented or patentable and registrations and applications therefor, including, but not limited to, all divisions, continuations, continuations-in-part, renewal applications, renewals, extensions and reissues; (b) published and unpublished works of authorship, whether copyrightable or not (including, but not limited to, computer software), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (c) trademarks, service marks, trade names, brand names, corporate names, domain names, logos, Internet domain names, trade dress, and other indicia of origin, and all elements thereof, all applications and registrations for all of the foregoing, the goodwill of any business symbolized thereby, and all common-law rights relating thereto; and (d) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including, but not limited to, rights to recover for past, present and future violations thereof.

"IT Systems" means electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, software, hardware, equipment and services (including, but not limited to, all applications and software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet web sites and related content.

"Interim Period" shall have the meaning set forth in Section 5.13(b).

"Knowledge" means (i) in the case of a party who is an individual, such party's actual knowledge, (ii) in the case of a party that is an entity (other than Company), the actual knowledge of any trustee, officer or director of such party after due inquiry, consistent with the performance of their duties in the ordinary course of business, and (iii) in the case of Company, the actual knowledge of Company's Chief Executive Officer, Chief Financial Officer, Vice President, Business Development, Vice President, Operations - Eastern Region, and Vice President, Operations - Rocky Mountain Region.

"Laws" shall have the meaning set forth in Section 3.6.

"Leased Premises" shall have the meaning set forth in Section 3.22(a).

10176897.8

6

"Leases" shall have the meaning set forth in Section 3.22(a).

"Licensed IP" means all Intellectual Property that Company is licensed or otherwise permitted by other Persons to use.

"Liens" means all mortgages, deeds of trust, collateral assignments, security interests, UCC financing statements, conditional or other sales agreements, liens, pledges, hypothecations, and other encumbrances on the Assets or the Stock, as applicable.

"Material Adverse Effect" means, with respect to any Person, any event, fact, condition, change, circumstance, occurrence or effect, which, either individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, assets, liabilities, capitalization, stockholders' equity, condition (financial or otherwise), operations, licenses or other franchises or results of operations of such Person, considered as a whole (excluding general economic conditions, conditions affecting the industry in which such Person operates, acts of war or terrorism or adverse effects arising from the announcement or consummation of the transactions contemplated hereby) or (ii) does or would reasonably be expected to materially impair or delay the ability of such Person (or, in the case of Company, the Sellers) to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

"Maximum Net Working Capital" shall have the meaning set forth in Section 2.2(b).

"Minimum Net Working Capital" shall have the meaning set forth in Section 2.2(b).

"Net Working Capital" means the excess of Company's current assets, as of a specific date, over Company's current liabilities, as of such date, in each case determined in accordance with GAAP and the accounting principles of Company, consistently applied, and immediately prior to the consummation of the purchase and sale of the Stock contemplated hereby; provided, that for purposes of calculating the Closing Date Net Working Capital hereunder, the parties agree that (A) current assets shall exclude (a) Cash, except for any Cash left in the accounts of Company to meet the Minimum Net Working Capital threshold in accordance with Section 2.2(b), and (b) all CSC Related Accounts Receivable, and (B) current liabilities shall (a) include, to the extent not paid from the Closing Purchase Price Payment, (i) the fees and expenses incurred by Company in connection with the transactions contemplated by this Agreement for legal and accounting advice, (ii) liabilities arising from any commitments made by Company and the Sellers to Company employees with respect to severance or change of control payments payable at or prior to the Closing, including the payments listed on Schedule 5.12, and (iii) the costs, fees and expenses incurred by Company in connection with the preparation of any Tax Return for periods ending on or before the Closing Date that are accrued by Company as a liability pursuant to this Agreement and (b) exclude (i) any liabilities of Company paid from the Closing Purchase Price Payment, including the fees, commissions, charges and expenses payable to BB&T Capital Markets | Windsor Group and any other broker, finder or investment banker of the Sellers and Company, (ii) all CSC Accrued Expenses and (iii) all Taxes of Company attributable to making the Election.

"Net Working Capital Adjustment" means the adjustments to the Purchase Price pursuant to Section 2.2.

"Neutral Auditor" shall have the meaning set forth in Section 2.2(c).

"Non-Competition Agreements" shall have the meaning set forth in Section 6.9.

"Notices" shall have the meaning set forth in Section 16.

"Permits" means all federal, state, local or foreign permits, grants, easements, consents, approvals, authorizations, exemptions, licenses, franchises, certificates, or orders of, any Governmental Authority or any other Person, required for Company to own the Assets or conduct the Business as now being conducted.

"Permitted Liens" means (i) Liens for Taxes not yet due and payable and for which Company shall have set aside full and adequate reserves on its books to the extent required by GAAP, (ii) Liens imposed by Law, such as carrier's, warehousemen's and mechanic's liens and other similar liens, which arise in the ordinary course of business with respect to obligations not yet due and for which Company shall have set aside full and adequate reserves on its books to the extent required by GAAP, and (iii) Liens as of the date hereof set forth on Schedule 3.9.

"Permitted Use" shall have the meaning set forth in Section 12.1.

"Person" means any individual, partnership, joint venture, corporation, trust, unincorporated organization, limited liability company, group, Governmental Authority, and any other person or entity.

"Personal Property" means all of the machinery, equipment, tools, vehicles, furniture, leasehold improvements, office equipment, plant, spare parts, and other tangible personal property which are owned or leased by Company and used or useful in the conduct of the Business or the operations of the Business, including, without limitation, the Personal Property identified on Schedule 3.10, plus such additions thereto and deletions therefrom between the date hereof and the Closing Date.

"Preliminary Closing Date Net Working Capital" shall have the meaning set forth in Section 2.2(b).

"Preliminary Closing Date Net Working Capital Statement" shall have the meaning set forth in Section 2.2(b).

"Pro Rata Share" means, with respect to (a) Carol A. Trawick – 51%; (b) James R. Trawick – 36%; (c) Mark E. Kleckner – 7% and (d) Gary H. Brown – 6%.

"Purchase Price" shall have the meaning set forth in Section 2.1.

"Regulations" means the United States treasury regulations promulgated under the Code.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into or through the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any real property, including the movement of Hazardous Substances through or in the air, soil, surface water, groundwater or property.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities or (iv) any other actions authorized by any Environmental Law or Governmental Authority.

"Representative" means, as to any Person, such Person's Affiliates and its and their directors, officers, employees, agents, advisors (including, without limitation, financial advisors, counsel and accountants) and direct and indirect controlling persons.

"Resolution Period" shall have the meaning set forth in Section 2.2(c)(iii).

"Section 338 Forms" shall have the meaning set forth in Section 5.17(d).

"Seller" and "Sellers" shall have the meaning set forth in the Preamble hereto.

"Seller Indemnification Obligations" means the unsatisfied indemnification obligations of the Sellers pursuant to Section 11.

"Sellers Representative" means Carol A. Trawick, as representative of the Sellers, or any successor Sellers Representative.

"Stock" shall have the meaning set forth in the Recitals hereto.

"Survival Period" shall have the meaning set forth in Section 11.1.

"Tax" (including with correlative meaning the terms "Taxes" and "Taxable") means (A) all foreign, federal, state, local and other income, gross receipts, sales, use, ad valorem, value-added, intangible, unitary, transfer, franchise, license, payroll, employment, estimated, excise, environmental, stamp, occupation, premium, property, prohibited transactions, windfall or excess profits, customs, duties or other taxes, levies, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (B) any liability for payment of amounts described in clause (A) as a result of transferee liability, of having been a member of an affiliated, consolidated, combined or unitary group for any period, or otherwise through operation of Law and (C) any liability for payment of amounts described in clause (A) or (B) as a result of any Tax sharing, Tax indemnity or Tax allocation agreement or any other express or implied agreement to indemnify any other person for Taxes.

"Tax Return" shall mean any return (including any information return), report, statement, schedule, notice, form, estimate or declaration of estimated tax relating to or required to be filed with any governmental authority in connection with the determination, assessment, collection or payment of any Tax.

"Transaction Documents" shall mean this Agreement, the Non-Competition Agreements, the Closing Promissory Notes, and the other agreements, certificates and instruments to be executed by any of the parties hereto in connection with or pursuant to this Agreement.

"Unwinding Actions" shall have the meaning set forth in Section 10.3.

## 2.  PURCHASE PRICE, CLOSING BALANCE SHEET AND INITIAL HOLDBACK

2.1  Purchase and Sale of the Stock. At the Closing, and upon all of the terms and subject to all of the conditions of this Agreement, the Sellers shall sell, transfer, assign and convey to Buyer, and Buyer shall purchase and accept from the Sellers, the Stock, free and clear of all Liens. At the Closing, the Sellers shall deliver, or cause to be delivered, to Buyer the original certificates evidencing all of the issued and outstanding shares of Stock, which certificates shall be either duly endorsed for transfer to, or accompanied by stock powers executed in favor of, Buyer or its nominee as Buyer may have directed prior to the Closing Date and otherwise in a form acceptable for transfer on the books of Company. In full payment for the Stock, Buyer shall pay to the Sellers (a) Forty-Two Million Five Hundred Thousand Dollars ($42,500,000) (the "Base Purchase Price"), as adjusted pursuant to Sections 2.2(b) and 2.2(c), and (b) the Earn-Out Payment (the Base Purchase Price, as adjusted pursuant to Sections 2.2(b) and 2.2(c), and the Earn-Out Payment are referred to collectively as the "Purchase Price"), all payable as provided in Sections 2.2 and 2.3.

2.2  Payment of Base Purchase Price; Purchase Price Adjustments; Initial Holdback Amount.

(a)  Closing Purchase Price Payment. At the Closing, Buyer shall pay the Sellers, by delivery of promissory notes in the form attached hereto as Exhibit B ("Closing Promissory Notes") and with principal amounts as the Sellers Representative may direct pursuant to a flow of funds memorandum mutually agreed to and executed by Buyer and the Sellers not less then one (1) day prior to the Closing, an amount equal to Forty Million Five Hundred Thousand Dollars ($40,500,000) plus or minus the amount by which the Base Purchase Price is adjusted pursuant to Section 2.2(b) (the "Closing Purchase Price Payment").

(b)  Preliminary Purchase Price Adjustment. Not later than three (3) days prior to the Closing Date, the Sellers shall deliver to Buyer a statement (the "Preliminary Closing Date Net Working Capital Statement") setting forth the Sellers' good faith estimate (the "Preliminary Closing Date Net Working Capital") of the Net Working Capital of Company as of the Closing Date (the "Closing Date Net Working Capital"). If the Preliminary Closing Date Net Working Capital exceeds Four Million Seven Hundred Fifty Thousand Dollars ($4,750,000) (the "Maximum Net Working Capital"), the Base Purchase Price shall be increased dollar-for-dollar

by the amount of such excess, and if the Preliminary Closing Date Net Working Capital is less than Four Million Two Hundred Fifty Thousand Dollars ($4,250,000) (the "Minimum Net Working Capital"), at the election of Buyer, either (i) the Base Purchase Price shall be decreased dollar-for-dollar by such shortfall or (ii) Cash in the amount of such shortfall shall be available in the accounts of Company on the Closing Date. The Base Purchase Price shall thereafter be subject to further adjustment as provided in Section 2.2(c) to arrive at the Purchase Price.

(c)    Final Purchase Price Adjustment.

(i)    Calculation of Adjustment. If the Closing Date Net Working Capital (determined in accordance with the procedures set forth in this Section 2.2(c)) is greater than the Maximum Net Working Capital, the Base Purchase Price (as adjusted pursuant to Section 2.2(b)) shall be increased dollar-for-dollar by the amount that the Closing Date Net Working Capital exceeds the Maximum Net Working Capital, less any positive adjustment made to the Base Purchase Price pursuant to Section 2.2(b) or plus any negative adjustment made to the Base Purchase Price pursuant to Section 2.2(b), as the case may be. If the Closing Date Net Working Capital (determined in accordance with the procedures set forth in this Section 2.2(c)) is less than the Minimum Net Working Capital, the Base Purchase Price (as adjusted pursuant to Section 2.2(b)) shall be decreased dollar-for-dollar by the amount that the Minimum Net Working Capital exceeds the Closing Date Net Working Capital, less any negative adjustment made to the Base Purchase Price pursuant to Section 2.2(b) or plus any positive adjustment made to the Base Purchase Price pursuant to Section 2.2(b), as the case may be. The amount of any decrease to the Base Purchase Price (as adjusted pursuant to Section 2.2(b)), pursuant to this Section 2.2(c)(i), shall be paid by the Sellers, in cash, by wire transfer in immediately available funds to an account designed by Buyer, which payment obligation shall be a joint and several obligation of the Sellers. The amount of any increase to the Base Purchase Price (as adjusted pursuant to Section 2.2(b)), pursuant to this Section 2.2(c)(i), shall be paid by Buyer, by wire transfer in immediately available funds to accounts as designated by the Sellers. Any payment owed by the Sellers or Buyer pursuant to this Section 2.2(c)(i) shall be paid within five (5) business days after the Final Closing Date Net Working Capital Statement is agreed to by the Sellers Representative and Buyer or determined by the Neutral Auditor in accordance with this Section 2.2(c).

(ii)    Preparation of Closing Date Balance Sheet. As soon as practicable, and in any event within sixty (60) days after the Closing Date, Buyer shall prepare or cause to be prepared and deliver to the Sellers Representative a balance sheet of Company as of the Closing Date ("Closing Date Balance Sheet") and a statement of the actual Closing Date Net Working Capital (the "Closing Date Net Working Capital Statement"). The Closing Date Net Working Capital Statement shall be prepared applying GAAP as modified by the definition of Net Working Capital contained herein.

(iii)    After receipt of the Closing Date Net Working Capital Statement, the Sellers Representative shall have thirty (30) days to review it. To the extent reasonably required to complete her review of the Closing Date Net Working Capital Statement, the Sellers Representative and her Representatives shall have reasonable access during normal business hours to the books and records of Company as well as the Closing Date Net Working

11

Capital Statement working papers of Buyer and to the employees of Company or Buyer who prepared such statement. The Sellers Representative shall deliver notice to Buyer on or prior to the 30th day after receipt of the Closing Date Net Working Capital Statement specifying in reasonable detail all disputed items and the basis therefor. If the Sellers Representative fails to deliver such notice in such 30 day period, the Sellers shall have waived their right to contest the Closing Date Net Working Capital Statement. If the Sellers Representative notifies Buyer of any objections to the Closing Date Net Working Capital Statement in such 30 days period, the parties shall, within 30 days following the date of such notices (the "Resolution Period"), attempt to resolve their differences and any written resolution by them as to any disputed amount shall be final and binding for all purposes under this Agreement.

(iv)    If at the conclusion of the Resolution Period the parties have not reached an agreement on any objections with respect to the Closing Date Net Working Capital Statement, then all amounts and issues remaining in dispute shall be submitted by the Sellers Representative and Buyer to a mutually acceptable independent accounting firm (the "Neutral Auditor") for a determination resolving such amounts and issues. Each party agrees to execute, if requested by the Neutral Auditor, a reasonable engagement letter with respect to the determination to be made by the Neutral Auditor. All fees and expenses relating to the work, if any, to be performed by the Neutral Auditor shall be borne by Buyer and the Sellers, respectively, in the proportion that the aggregate dollar amount of the disputed items submitted to the Neutral Auditor by such party that are unsuccessfully disputed by such party (as finally determined by the Neutral Auditor) bears to the aggregate dollar amount of disputed items submitted by Buyer and the Sellers Representative. Any such fees and expenses of the Neutral Auditor payable by the Sellers shall be paid by the Sellers in cash, which payment obligation shall be a joint and several obligation of the Sellers. Except as provided in the preceding sentence, all other costs and expenses incurred by the parties in connection with resolving any dispute hereunder before the Neutral Auditor shall be borne by the party incurring such cost and expense. The Neutral Auditor shall determine only those issues still in dispute at the end of the Resolution Period and the Neutral Auditor's determination shall be based upon and consistent with the terms and conditions of this Agreement. The determination by the Neutral Auditor shall be based solely on presentations with respect to such disputed items by Buyer and the Sellers Representative to the Neutral Auditor and not on the Neutral Auditor's independent review. Buyer and the Sellers Representative shall use their reasonable best efforts to make their respective presentations as promptly as practicable following submission to the Neutral Auditor of the disputed items, and each such party shall be entitled, as part of its presentation, to respond to the presentation of the other party and any questions and requests of the Neutral Auditor. In deciding any matter, the Neutral Auditor (i) shall be bound by the provisions of this Section 2.2(c)(iv) and (ii) may not assign a value to any item greater than the greatest value for such item claimed by either Buyer or the Sellers Representative or less than the smallest value for such item claimed by Buyer or the Sellers Representative. The Neutral Auditor's determination shall be made within 45 days after its engagement (which engagement shall be made no later than five business days after the end of the Resolution Period), or as soon thereafter as possible, shall be set forth in a written statement delivered to the Sellers Representative and Buyer and shall be final, conclusive, non-appealable and binding for all purposes hereunder; provided that such determination may be reviewed, corrected or set aside by a court of competent jurisdiction, but only if upon a finding that the Neutral Auditor committed

10176897.8

12

manifest error with respect to its determination. The determination of the Neutral Auditor shall not be deemed an award subject to review under the Federal Arbitration Act or any other similar statute. The term "Final Closing Date Net Working Capital Statement" shall mean the definitive Closing Date Net Working Capital Statement agreed to by the Sellers Representative and Buyer in accordance with Section 2.2(c)(iii) or the definitive Closing Date Net Working Capital Statement resulting from the determination made by the Neutral Auditor in accordance with this Section 2.2(c)(iv).

        (d).    Initial Holdback Amount. Buyer shall be entitled to retain from the Base Purchase Price the Initial Holdback Amount. On the first anniversary of the Closing Date, Buyer shall pay to the Sellers, by wire transfer of immediately available funds to such accounts as the Sellers may direct, an amount equal to the balance of the Initial Holdback Amount, minus (i), if due and payable on the first anniversary of the Closing Date, the retention incentive payment amount to be paid by Company to Elaine Watson in accordance with the terms of the underlying employment agreement, and (ii) any unsatisfied Seller Indemnification Obligations for which Buyer has provided notice under Section 11.4(a). If the Sellers Representative shall timely deliver to Buyer an objection notice pursuant to Section 11.4(b) hereof, the Sellers Representative and Buyer shall attempt to agree upon the rights of the respective Parties with respect to any amount withheld from the Initial Holdback Amount as a result of any such claim for unsatisfied Seller Indemnification Obligations. If the Sellers Representative and Buyer should so agree as to the validity and amount of such claim made in Buyer's notice, a joint written agreement with respect to the amount of such claim shall be prepared and signed by both such Parties and Buyer shall be entitled to retain such amount from the Initial Holdback Amount. If no such agreement can be reached after thirty (30) days following the delivery of the Sellers Representative's objection notice, then the dispute may be resolved through a legal action in accordance with Section 23.

        2.3    Earn-Out Payments.

        (a)    Calculation of Earn-Out Payment. As part of the Purchase Price for the Stock, Buyer shall, or shall cause Company to, pay to the Sellers Three Million Five Hundred Thousand Dollars ($3,500,000) in cash as an earn-out payment (the "Earn-Out Payment"). The Earn-Out Payment shall be payable to the Sellers only if the total amount of Company's EBITDA for the twelve-month period ending December 31, 2006 (including those portions of the period both prior to and after the Closing Date, the "Earn-Out Period") is equal to or exceeds $8,500,000. Buyer shall pay the Earn-Out Payment to the Sellers in cash in accordance with Section 2.3(b) below.

        (b)    Payment and Dispute Procedures.

        (i)    No later than ten (10) days after Company receives from its accountants the audited financial statements for the Earn-Out Period, prepared in accordance with GAAP, Buyer will deliver to the Sellers a notice (the "Earn-Out Notice") setting forth Buyer's determination of EBITDA for the Earn-Out Period and stating whether the Sellers are entitled to the Earn-Out Payment together with a copy of the audited financial statements of Company for the Earn-Out Period. EBITDA shall be calculated consistent with the methodology

10176897.8

13

used by Company to calculate EBITDA as set forth on Schedule 3.15. If the Earn-Out Notice provides that the Sellers are entitled to the Earn-Out Payment, Buyer shall make the applicable Earn-Out Payment on the first anniversary of the Closing Date, by wire transfer of immediately available funds in such accounts as the Sellers may direct. Additionally, Buyer will pay the Sellers interest on the Earn-Out Payment at the rate of 7.25% per annum, from the later of the date of Buyer's notice that the Sellers are entitled to the Earn-Out Payment, or the date of the final determination by the Neutral Auditor that the Earn-Out Payment is due through the date the Earn-Out Payment is made by Buyer. If the Earn-Out Notice provides that the Sellers are not entitled to the Earn-Out Payment, and the Sellers Representative disagrees with Buyer's determination, the Sellers Representative shall notify Buyer no later than 30 days after the Earn-Out Notice is delivered of the Sellers' objections and the basis therefor. Failure of the Sellers Representative to notify Buyer of concurrence or disagreement with the matters set forth in the Earn-Out Notice within 30 days after delivery of the Earn-Out Notice shall be deemed to be concurrence by all of the Sellers. If an objection is made, Buyer and the Sellers Representative will negotiate in good faith to reach an agreement regarding the matters in dispute. Buyer agrees to provide the Sellers Representative promptly upon request with all documents and work papers related to Buyer's determination of EBITDA for the Earn-Out Period. If Buyer and the Sellers Representative, notwithstanding such good faith effort, fail to resolve all matters in dispute within 30 days after the Sellers Representative advises Buyer of its objections, then any remaining disputed matters will be finally and conclusively determined by a Neutral Auditor pursuant to Section 2.2(c)(iv) as if the dispute was a dispute concerning the Closing Date Net Working Capital Statement, and the Neutral Auditor's determination shall be based upon and consistent with the terms and conditions of this Agreement. If the Neutral Auditor's report indicates that the Sellers are entitled to the Earn-Out payment, Buyer shall make such payment on the later of (i) the first anniversary of the Closing Date and (ii) within five (5) business days of the issuance of such report, by wire transfer of immediately available funds in such accounts as the Sellers may direct. Buyer shall have the right to offset any unsatisfied Seller Indemnification Obligations against the Earn-Out Payment due and payable to the Sellers following the procedures set out below.

(ii)    If Buyer is to offset against amounts due or that may become due under the Earnout Payment any unsatisfied claim for indemnification under this Agreement, prior to any such offset, Buyer shall have complied in all respects with the provisions of Section 11.4. The portion of the Earnout Payment equal to the amount of the proposed offset shall be suspended until the claim or dispute that is the basis for the proposed set-off is either (i) resolved by the parties in writing or (ii) determined by a court of competent jurisdiction pursuant to Section 11.4(b). Any amount of the Earnout Payment in excess of the unsatisfied indemnity claim shall be paid in accordance with Section 2.3(b)(i). Any proposed offset under this Section is subject to the limitations on indemnity set out in Section 11.5.

(c)    Covenants Regarding Earn-Out. After the Closing and until the end of the Earn-Out Period:

(i)    Buyer shall maintain a financial reporting system that will separately account for the revenues and expenses of Company. Buyer further agrees that expenses or costs of Buyer or its Affiliates which are not part of the Business or Company shall

10176897.8

14

not be allocated to Company for the purposes of calculating EBITDA of Company without the prior written consent of the Sellers Representative. Buyer shall cause Company to operate Company's business in a manner reasonably consistent with past practices of the Business, but taking into account the acquisition of Company by Buyer as a wholly-owned subsidiary of Buyer, changes in the administrative operations of Company as a result of such acquisition, and other changes reasonably related to Company being a wholly-owned subsidiary of Buyer; provided, however, that Buyer shall not cause Company to pay a management fee or other payment to Buyer or any Affiliate of Buyer unless such amount is excluded from the computation of EBITDA. Buyer shall, and shall cause Company to, remain in material compliance with all applicable Laws (including, but not limited to, the Federal Acquisition Regulations) and shall not take any action with the purpose or effect of causing Buyer to not be required to pay the Earn-Out Payment to the Sellers. Company shall, and Buyer shall cause Company to, retain the name "Trawick & Associates" throughout the Earn Out Period. During the Earn-Out Period, Carol A. Trawick shall continue to be employed by Company as its Chief Executive Officer on the same terms and conditions, and for the same compensation, as in effect on the date of this Agreement.

(ii)    In the event that Buyer or Company determines to acquire in any manner assets for use primarily in the Business in a transaction outside the ordinary course of the Business involving in excess of $5 million, Buyer and the Sellers Representative shall negotiate in good faith an appropriate adjustment to the EBITDA target set forth in this Section 2.3 to take into account the impact that would be expected to occur as a result of such acquisition. In the event the parties are unable to agree upon the appropriate adjustment to the EBITDA target within 30 days of the consummation of such acquisition, Buyer and the Sellers Representative shall engage a mutually agreed independent nationally recognized accounting or investment banking firm to make a binding determination of the appropriate adjustments.

(iii)    In the event, during the Earn-Out Period, Company sells, transfers, assigns or otherwise disposes of (directly or indirectly) any of its assets used primarily in the Business (other than to Buyer or any of its Affiliates, in which event the EBITDA arising from such assets shall be allocated to Company for purposes of calculating whether Company has achieved the targets described in Section 2.3(a)), or Buyer sells voting control or a majority of stock in Company, or causes Company to merge with another company, then Buyer shall pay to the Sellers in cash the Earn-Out Payment.

2.4    Payments On or Before Closing. The Sellers shall pay, from the Closing Purchase Price Payment, all fees, commissions and charges of any broker, finder or investment banker (including, but not limited to, fees and expenses payable to BB&T Capital Markets | Windsor Group) resulting from the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Company or any of the Sellers. Company or the Sellers, as the case may be, shall pay, on or before the Closing, all amounts payable for legal, accounting and other similar fees and expenses incurred in connection with or otherwise related to the transactions contemplated by this Agreement. Subject to the provisions in Section 5.12, Company shall pay, on or before the Closing, (i) any severance required to be paid to employees of Company who cease their employment as of or prior to the Closing Date and (ii) any bonus payments required to be paid to employees on or prior to Closing.

10176897.8

15

2.5     Form of Payments.  Except as expressly provided in Section 2.2(a), all payments hereunder shall be made by delivery to the recipient by depositing, by bank wire transfer, the required amount (in immediately available funds) in an account of the recipient, which account shall be designated by the recipient in writing at least three (3) business days prior to the date of the required payment; provided, that, in the case of each payment to be made to or by the Sellers hereunder, each Seller shall receive or be responsible for his or her Pro Rata Share of such payment.

2.6     Excluded Assets.  Buyer, Company and the Sellers acknowledge and agree that the assets and related liabilities of Company set forth on Schedule 2.6 (the "Excluded Assets") will be transferred or distributed by Company to one or more of the Sellers at or prior to the Closing, as set forth on Schedule 2.6.  The Excluded Assets and any related liabilities shall not transfer with Company to Buyer and shall be transferred by Company to the applicable Sellers on or before the Closing Date.

3.     REPRESENTATIONS AND WARRANTIES OF COMPANY AND THE SELLERS

Company and the Sellers jointly (except with respect to the representations and warranties contained in Sections 3.2(a), 3.3 and 3.5 to the extent they apply to the Sellers, which representations and warranties shall be made by each Seller severally) and severally represent and warrant to Buyer the following matters.  These representations and warranties are, and the information set forth in the Disclosure Schedules referenced therein is, current as of the date of this Agreement and as of the Closing Date, except to the extent that a representation, warranty or Schedule expressly states that such representation or warranty, or information in such Schedule, is current only as of an earlier date or as of the date of this Agreement.

3.1     Organization.  Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Maryland and is qualified or registered to do business in each jurisdiction in which the nature of its business or operations would require such qualification or registration.  Company has full power and authority to own, lease and operate its property and Company has full corporate power and authority to carry on its business as now conducted and to enter into and to perform this Agreement.  The address of Company's principal office and all of Company's additional places of business are listed on Schedule 3.1.  Except as set forth on Schedule 3.1, during the past five (5) years, Company has not been known by or used any corporate, fictitious or other name in the conduct of the Business or in connection with the use or operation of the Assets.

3.2     Authorization; Corporate Documentation.

(a)     Company and each Seller has the requisite corporate or capacity and authority to execute and deliver this Agreement and the other Transaction Documents to which it, she or he is a party, to perform its, her or his obligations hereunder and thereunder, and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the other Transaction Documents by Company and each Seller, and

Company's and each Seller's consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate or other action of Company and each Seller.

(b)     The copies of the Articles of Incorporation of Company and all amendments thereto, as certified by the Maryland State Department of Assessments and Taxation, and the Bylaws of Company, as amended to date and certified by its corporate secretary, copies of which have heretofore been delivered to Buyer, are true, complete and correct copies of the Articles of Incorporation and Bylaws of Company, as amended through and in effect on the date hereof and as of the Closing Date.

(c)     The minute books and records of the corporate proceedings of Company, copies of which have been delivered to Buyer and originals of which will be delivered to Buyer on the Closing Date are true, correct and complete in all material respects. There have been no changes, alterations or additions to such minute books and records of the corporate proceedings of Company on or prior to the Closing Date that have not been furnished to Buyer's counsel.

3.3     Title to the Stock; Subsidiaries. Sellers own good, valid and marketable title to the Stock, free and clear of any and all Liens, and upon delivery of the Stock to Buyer on the Closing Date in accordance with this Agreement and upon Buyer's payment of the Purchase Price, good, valid and marketable title to the Stock, free and clear of all Liens, will pass to Buyer.

3.4     Capitalization. The authorized capital stock of Company consists of 100 shares of common stock, no par value. The number of shares of the issued and outstanding capital stock of Company owned by each Seller is set forth on Schedule 3.4, which shares constitute all of the issued and outstanding capital stock of Company. The Stock (i) has been duly and validly issued; (ii) is fully paid and nonassessable; and (iii) is held of record by each of the Sellers as set forth on Schedule 3.4. Except as set forth on Schedule 3.4, there are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to Company, nor are there any voting trusts, proxies, shareholder agreements or any other agreements or understandings with respect to the voting of the Stock. Except as set forth on Schedule 3.4, there are no options, warrants or other rights to subscribe for or purchase any capital stock or other equity interests of Company or securities convertible into or exchangeable for, or that otherwise confer on the holder any right to acquire any capital stock of Company, or preemptive rights or rights of first refusal or first offer nor are there any contracts, commitments, agreements, understandings, arrangements or restrictions to which Company or any Seller is a party or by which Company or any Seller is bound relating to any shares of the Stock or any other equity securities of Company, whether or not outstanding.

3.5     Binding Agreement.     This Agreement has been duly executed by Company and the Sellers and delivered to Buyer, and constitutes the legal, valid and binding agreement of Company and the Sellers, enforceable against Company and the Sellers in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally and the exercise of judicial discretion in accordance with general equitable principles. Upon execution and delivery at the Closing by

10176897.8

Company and/or each Seller which is a party thereto, each other Transaction Document to which Company or either Seller is, or is specified to be, a party, will be duly and validly executed by Company and each Seller which is a party thereto and delivered to Buyer on the Closing Date, and will constitute (assuming, in each case, the due authorization, execution and delivery by each other party thereto) each Seller's and Company's legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally and the exercise of judicial discretion in accordance with general equitable principles.

       3.6    No Breach.    Subject to the necessity of obtaining approvals of or providing notice to certain Governmental Authorities (including any necessary approval, or the termination or expiration of any waiting period, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act")) as listed on Schedule 3.6 and consents of third parties to certain Contracts as listed on Schedule 3.13 and certain Leases as listed on Schedule 3.22, the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby by Company and the Sellers do not and will not (A) violate or conflict with Company's Articles of Incorporation or Bylaws, any organizational or other constituent document of any Seller or any constitution, treaty, law, statute, rule, regulation, ordinance, code, directive, writ, injunction, settlement, permit, license, decree, judgment, award, consent or order (collectively, "Laws") by or of any Governmental Authority to which Company, any of the Sellers, the Stock or the Assets are subject, or by which Company, any of the Sellers, the Stock or the Assets may be bound, (B) (with or without giving notice or the lapse of time or both) breach or conflict with, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any Contract, agreement, or other commitment to which Company or any of the Sellers is a party or by which Company, any of the Sellers, the Stock or the Assets may be bound or result in the imposition of a Lien on the Stock or any of the Assets or (C) require any filing with, or Permit, consent or approval of, or the giving of any notice to, any Governmental Authority or third party.

       3.7    Permits.    Company possesses all Permits required to own the Assets and conduct the Business as now being conducted. All Permits of Company are valid and in full force and effect.

       3.8    Compliance With Laws.    Except as set forth in Schedule 3.8, Company and the Sellers have complied in all material respects with all Laws of any Governmental Authority applicable to Company, the Stock, the Business and the Assets. Specifically, but without limitation, Company and the Sellers have, in the conduct of the Business, complied in all material respects with all applicable Laws relating to the employment of labor, including those concerning wages, hours, equal employment opportunity, pension and welfare benefit plans (including the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder ("ERISA")), and the payment of Social Security and similar taxes, and Company is not liable for any arrearages of wages or any Tax penalties due to any failure to comply with any of the foregoing.

10176897.8

18

3.9     Title to and Sufficiency of Assets. Except as set forth on Schedule 3.9, Company has good and marketable title to all of the Assets, free and clear of all Liens. The Assets constitute all of the assets, rights and properties that are necessary for the operation of the Business as it is now conducted or that are used or held by Company for use in the operation of the Business. All Excluded Assets identified on Schedule 2.6 as personal property of certain Sellers are owned by such Sellers, have been purchased using funds of such Sellers or the then current book value of such assets has been or will be prior to Closing reimbursed to Company and are not necessary for the operation of the Business as it is now being conducted.

3.10    Condition of Personal Property. Except as set forth in Schedule 3.10 or with other immaterial and minor exceptions, to the Knowledge of Company and the Sellers, as of the date of this Agreement, all items of Personal Property with a value greater than $20,000 individually used or useful in the operation of the Business are in good operating condition and repair (reasonable wear and tear excepted), and are suitable for their intended use.

3.11    Accounts Receivable. All accounts receivable of Company shown on all balance sheets included in the Financial Statements arose from sales actually made or services actually provided in the ordinary course of business. To the Knowledge of Company and the Sellers, the billed accounts receivable set forth on Schedule 3.11 (as of the date set forth therein) have been collected or are fully collectible according to their terms in amounts not less than the aggregate amounts thereof carried on the books of Company.

3.12    Intellectual Property; No Infringement.

(a)     Schedule 3.12 sets forth all (i) registered or material Company IP; and (ii) material Licensed IP, copyrights, registered trademarks, patents and patent applications of Company. Company rights in Company IP subject to a Contract set forth on Schedule 3.13 are allocated as provided by the applicable Contract, and as amended or modified by the parties thereto. Except as specified on Schedule 3.12, Company and the Sellers have no Knowledge of any facts or circumstances that may constitute violation, infringement, dilution, misappropriation, or other unauthorized use (i) by Company of any Intellectual Property of any other Person or (ii) by any other Person of any Company IP. Neither Company nor Sellers has made or received any complaint, assertion, threat or allegation or otherwise has notice of any lawsuit, claim, demand, proceeding, action or investigation of any nature involving matters of the type contemplated by the immediately preceding sentence.

(b)     All Company IP is valid and subsisting, and Company has good title to each item of Company IP, free and clear of all Liens.

(c)     Company owns or has the right to use pursuant to a license, sublicense, agreement or permission all Business IP. The Business IP constitutes all Intellectual Property that is used by Company in or necessary for the conduct of the Business as currently conducted.

(d)   Company has timely made all filings, payments and ownership recordations with the appropriate foreign and domestic agencies required to maintain in subsistence through the Closing all registered Company IP.

(e)   Except as set forth on Schedule 3.12, Company has taken all reasonable measures to protect the value of all Company IP (including entering into appropriate confidentiality and intellectual property agreements with all officers, directors, employees, and other Persons with access to the Company IP) and has required all employees, agents, consultants and contractors who have contributed to or participated in the development, improvement or modification of any Company IP to assign all of their rights therein to Company. None of the Company IP that is a trade secret has been disclosed to any Person other than Company's employees, consultants or contractors who had a need to know and use such Company IP in the ordinary course of employment or contract performance and who executed appropriate confidentiality agreements prohibiting the unauthorized use or disclosure of such Company IP.  To the Knowledge of Company and the Sellers, (i) no Person has any basis for claiming any right, title or interest in and to any such Company IP; and (ii) no such claim is currently pending or has been threatened.

(f)   To the Knowledge of Company and the Sellers, no current or former Company employee, consultant or contractor is or was a party to any confidentiality agreement and/or agreement not to compete that restricts or forbids, or restricted or forbade at any time during such Person's employment or other engagement by Company, such Person's performance of the activity that such Person was hired to perform or otherwise performed on behalf of or in connection with such Person's employment or engagement by Company.

(g)   Company's IT Systems are adequate in all material respects for the operation of the Business as currently operated by Company, and are in good working condition (normal wear and tear excepted).  There has not been any material malfunction with respect to any of Company's IT Systems since January 1, 2004 that has not been remedied in all material respects.

(h)   To the Knowledge of Company and the Sellers, all Data that is used and held for use in the Business by Company does not infringe or violate the rights of any Person and Company is in compliance with all applicable Laws with respect to such Data. Company has taken all reasonable measures to protect the privacy of any such Data which is required by applicable Law to be treated as private and, to the Knowledge of Company and the Sellers, since January 1, 2004 there have been no security breaches with respect to any such Data required to be maintained as private.

3.13   Contracts.   Schedule 3.13 identifies or describes all of the Contracts (including, but not limited to, all Contracts relating to Company IP) in effect on the date of this Agreement that provide for continuing obligations by any party thereto (other than (i) Leases, which are dealt with separately in Section 3.22 hereof, (ii) immaterial service and maintenance and equipment lease Contracts entered in connection with Company's office equipment and machinery, for which the aggregate obligations under all such Contracts described in this clause (ii) does not exceed $5,000 per month, and (iii) Contracts relating to Excluded Assets).  In

10176897.8

addition, <u>Schedule 3.13</u> identifies all Contracts (again, other than Leases) for which third party consents or waivers must be obtained on or prior to the Closing Date (or which have been obtained) in order for such Contracts to continue in effect according to their terms after the Closing Date. Company and the Sellers have provided Buyer true and complete copies of all written Contracts set forth on <u>Schedule 3.13</u> (including any and all amendments and other modifications to such Contracts) and true and correct summaries of all non-written Contracts, other than those which do not create for Company obligations in the aggregate in excess of $50,000 per year or $250,000 for all years. All of Company's oral Contracts are identified in the Disclosure Schedules, other than those oral Contracts which (i) may be terminated at any time or (ii) do not create for Company obligations in the aggregate in excess of $50,000 per year or $250,000 for all years. Company has all the Contracts it needs to carry on the Business in all material respects as now being conducted. All of the Contracts are in full force and effect, and are valid, binding, and enforceable in accordance with their terms, except to the extent that the enforceability thereof may be affected by bankruptcy, insolvency, or similar laws affecting creditors' rights generally or by court-applied equitable principles. Company is not in material breach, nor, to the Knowledge of the Sellers and Company, is any other party in material breach, of the terms of any Contract. Except as expressly identified on <u>Schedule 3.13</u>, (i) Company has not received notice of an intention by any party to any Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof, other than modifications in the ordinary course of business that do not materially adversely affect Company and (ii) the consummation of the transactions contemplated by this Agreement will not affect the validity, enforceability and continuation (all in accordance with the terms of the Contracts) of any of such Contracts as of the date hereof. Company has not waived any material rights under any such Contract. To the Knowledge of the Sellers and Company, no event has occurred which either entitles, or would, with notice or lapse of time or both, entitle any party to any Contract (other than Company) to declare a default or to accelerate, or which does accelerate, the maturity of any indebtedness of Company under any Contract.

3.14    <u>Litigation</u>. Except as described on <u>Schedule 3.14</u>, there is no litigation, proceeding (arbitral or otherwise), claim, action, suit, judgment, decree, settlement, rule or order or investigation of any nature pending, rendered since January 1, 2003, or, to Company's or the Sellers' Knowledge, threatened against Company other than standard audits by DCAA and other standard reviews and investigations by Governmental Authorities in connection with Company's Government Contracts, which standard audits, reviews and investigations could not reasonably be expected to have a Material Adverse Effect on Company. There are no writs, injunctions, decrees, arbitration decisions, unsatisfied judgments or similar orders outstanding against Company.

3.15    <u>Financial Statements; EBITDA</u>. <u>Schedule 3.15</u> sets forth true, correct and complete copies of the audited balance sheet, income statement and statement of cash flows of Company for the fiscal year ended December 31, 2004, audited balance sheet, income statement and statement of cash flows of Company for the fiscal year ended December 31, 2005 (each including any related notes and schedules) and unaudited balance sheets and statements of income of Company as of June 30, 2006 and for the period from January 1 to June 30, 2006 (the "Financial Statements"). The Financial Statements were prepared in accordance with the books and records of Company, and fairly and accurately present, in all material respects, the financial

10176897.8

21

condition of Company at the respective dates set forth therein and for the periods covered thereby in accordance with GAAP. The Financial Statements have been prepared in accordance with GAAP, consistently applied throughout and among the periods indicated, except that the unaudited statements exclude the footnote disclosures and other presentation items required for GAAP. Schedule 3.15 additionally sets forth the EBITDA of Company for the twelve month period ended June 30, 2006, with such adjustments as noted on Schedule 3.15. The EBITDA calculation set forth on Schedule 3.15 was prepared in accordance with the books and records of Company, and fairly and accurately presents, in all material respects, the adjusted EBITDA of Company at the respective dates set forth thereon and for the periods covered thereby. The unaudited balance sheet and income statement of Company to be delivered to Buyer in accordance with Section 6.12, when delivered, will be prepared in accordance with GAAP, consistently applied throughout and among the periods indicated, excluding footnote disclosures and other presentation items required for GAAP. The unaudited balance sheet and income statement of Company and the calculation of EBITDA to be delivered to Buyer in accordance with Section 6.12, when delivered, will be prepared in accordance with the books and records of Company, and will fairly and accurately present, in all material respects, the adjusted EBITDA of Company at the respective dates set forth thereon and for the periods covered thereby.

      3.16   Liabilities. Company has no liabilities, obligations or commitments of any nature (whether absolute, accrued, contingent or otherwise and whether matured or unmatured), including, without limitation, tax liabilities due or to become due, except (a) liabilities that are accrued and reflected on the Financial Statements, (b) liabilities that are listed on Schedule 3.16 to this Agreement, (c) liabilities that have arisen in the ordinary course of business since June 30, 2006 and have not had and could not reasonably be expected to have a Material Adverse Effect or (d) obligations to perform after the date hereof any Contracts which have been disclosed on Schedule 3.13 or which are not required to be disclosed on Schedule 3.13 because such Contracts do not meet the disclosure thresholds under Section 3.13.

      3.17   Tax Matters.

      (a)   Company has been a validly electing S corporation within the meaning of Code Sections 1361 and 1362 at all times since April, 2003. Except for the transactions contemplated by this Agreement, since April, 2003, neither Company nor any Seller has taken any action that would cause Company to lose its status as an S corporation as defined in Sections 1361 and 1362 of the Code. Company has not, in the past 10 years, (i) acquired assets from another corporation in a transaction in which Company's Tax basis for the acquired assets was determined, in whole or in part, by reference to the Tax basis of the acquired assets (or any other property) in the hands of the transferor or (ii) acquired the stock of any corporation which is a qualified subchapter S subsidiary.

      (b)   Except as disclosed on Schedule 3.17 hereto: (i) Company has filed all Tax Returns required to have been filed by it; (ii) all such Tax Returns are accurate and complete in all material respects; (iii) Company has paid all Taxes owed by it which are due and payable (whether or not shown on any Tax Return); (iv) Company is not currently the beneficiary of any extension of time within which to file any Tax Return; (v) no claim has ever been made by an authority in a jurisdiction where Company does not file Tax Returns that it is or

10176897.8

22

may be subject to taxation by that jurisdiction; (vi) there are no Liens on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Tax; (vii) no unpaid Tax deficiency has been asserted against or with respect to Company or any Sellers by any Tax authority; (viii) Company has collected or withheld all amounts currently required to be collected or withheld by it for any Taxes, and all such amounts have been paid to the appropriate governmental agencies or set aside in appropriate accounts reflected on the Financial Statements for future payment when due; (ix) Company is in compliance with, and its records contain all information and documents currently necessary to comply with, all applicable information reporting and Tax withholding requirements; (x) the balance sheets contained in the Financial Statements fully and properly reflect, as of the dates thereof, the liabilities of Company for all accrued Taxes; (xi) for periods ending after the date of the most recent Financial Statements provided to Buyer, the books and records of Company fully and properly reflect its liabilities for all accrued Taxes; (xii) neither Company nor any Seller has granted, nor is subject to, any waiver of the period of limitations for the assessment of Tax for any currently open taxable period; (xiii) Company is not required to include in income any amount for an adjustment pursuant to Section 481 of the Code or the Regulations thereunder; (xiv) Company is not a party to any Tax allocation or sharing agreement; and (xv) Company neither (A) has been a member of an affiliated group of corporations (within the meaning of Section 1504(a) of the Code) filing a consolidated federal income Tax Return nor (B) has any liability for the Taxes of any person under Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise. No Seller is a "foreign person" for purposes of Section 1445 of the Code.

3.18    Insolvency Proceedings.    Neither Company, the Sellers nor any of the Stock or the Assets is the subject of any pending, rendered or threatened insolvency proceedings of any character. Neither Company nor any of the Sellers has made an assignment for the benefit of creditors or taken any action with a view to or that would constitute a valid basis for the institution of any such insolvency proceedings. Neither Company nor any of the Sellers is insolvent and neither will become insolvent as a result of entering into this Agreement.

3.19    Employee Benefit Plans.

(a)    Schedule 3.19 contains a true and complete list and summary of all employee benefit plans (within the meaning of Section 3(3) of ERISA, including, without limitation, any deferred compensation arrangements and bonus compensation plans or policies, all retirement, pension, profit sharing, bonus, severance pay, change in control, retention, equity-based, disability, health, vacation and sick leave benefits) maintained, contributed to or sponsored by Company or under which Company has any current liability (collectively, "Benefit Plans"). With respect to any Benefit Plan, (i) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of Company and the Sellers, threatened, (ii) to the Knowledge of Company and the Sellers, no facts or circumstances exist that could give rise to any such actions, suits or claims, (iii) no administrative investigation, audit or other administrative proceeding by the Department of Labor, the Pension Benefit Guaranty Corporation, the Internal Revenue Service or other governmental agencies are pending or, to the Knowledge of Company and the Sellers, threatened, (iv) each Benefit Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has

10176897.8

23

# EXHIBIT A

# PART 2

received a favorable determination letter as to its qualification, and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification, and (v) each Benefit Plan has been established and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other applicable Laws.

(b)     Company does not maintain, sponsor or contribute to, nor has Company maintained, sponsored or been obligated to contribute to, within the last six years, any Benefit Plan which is subject to Title IV of ERISA or Section 412 of the Code. No event has occurred and no condition exists that would subject Company, either directly or by reason of their affiliation with any member of its "Controlled Group" (defined as any organization which is a member of a controlled group of organizations within the meaning of Code Sections 414(b), (c), (m) or (o)), to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable laws, rules and regulations. Neither Company nor any member of its Controlled Group maintains retiree life or retiree health insurance plans that provide for continuing benefits or coverage for any participant or any beneficiary of a participant except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") or at the sole expense of the participant or any participant's beneficiary. Each of Company and any member of its Controlled Group that maintains a "group health plan" within the meaning of Section 5000(b)(1) of Code has complied in all material respects with the notice and continuation requirements of Section 4980B of the Code, COBRA, Part 6 of Subtitle I of ERISA and the regulations thereunder.

(c)     No Benefit Plan exists that, as a result of the transaction contemplated by this Agreement (whether alone or in connection with any subsequent event(s)) could result in the payment to any current or former employee or director of Company of any money or other property (or the funding of any payment or benefit) or could result in the acceleration or provision of any other rights or benefits to any current or former employee or director of Company or result in payments which would not be deductible under Section 280G of the Code.

(d)     With respect to each Benefit Plan, Company has provided or made available to Buyer a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable: (i) any related trust agreement or other funding instrument; (ii) the most recent determination letter, if applicable; (iii) any summary plan description and other written communications (or a description of any oral communications) by the Sellers or Company to the current or former employees concerning the extent of the benefits provided under a Benefit Plan; and (iv) for the two most recent years (A) the Form 5500 and attached schedules, (B) audited financial statements and (C) actuarial valuation reports.

3.20    Insurance.    Schedule 3.20 lists all insurance policies (by policy number, insurer, location of property insured, annual premium, premium payment dates, expiration date and type of coverage) held by Company relating to the Assets and the Business, properties and employees of Company, copies of which have been provided to Buyer. All such insurance policies are in full force and effect as of the date hereof. Company is not in default under any

such policy. Company has timely filed claims with insurers with respect to all material matters and occurrences for which it has coverage. By their terms, all insurance policies maintained by Company will remain in full force and effect following consummation of the transactions contemplated by this Agreement (subject to Company's continuing compliance with the applicable terms thereof and any right of insurers to terminate without cause), and Company has not received any notice or other indication from any insurer or agent of any intent to cancel or not so renew any of such insurance policies. Company has complied with and implemented in all material respects all outstanding (i) requirements of any insurance company that has issued a policy with respect to any of the Assets and (ii) requirements of any Governmental Authority with respect to any such insurance policy.

3.21   Environmental Matters.

(a)   There are no Environmental Claims pending or, to the Knowledge of the Sellers or Company, threatened against any of Company or the Sellers under or relating to Environmental Laws including without limitation those that allege, involve or relate to violations of Environmental Law, Environmental Losses or the Release, use, disposal or arranging for disposal of any Hazardous Materials on or from any real property constituting or connected with the Leased Premises or any other real property or facility formerly owned, leased or used by Company.

(b)   Except as could not reasonably be expected to result in material liability to Company under or relating to Environmental Laws, there are no material amounts of Hazardous Materials that have been Released or are being stored or are otherwise present on, under or about any real property constituting or connected with the Leased Premises, and except as could not reasonably be expected to result in material liability to Company under or relating to Environmental Laws, material amounts of Hazardous Materials have not been Released, stored or are otherwise present on, under or about any real property formerly owned, leased or operated by Company. Each of the Leased Premises, during the period it was leased by Company, has been maintained in, and Company is and has at all prior times otherwise been in, material compliance with all applicable Environmental Laws and have obtained and are in compliance in all material respects with all permits and licenses required under all applicable Environmental Laws to operate the Business.

(c)   Neither Company nor any predecessor in interest has disposed of, or arranged to dispose of, Hazardous Materials at any location other than a site lawfully permitted to receive such Hazardous Materials.

(d)   Except as set forth in Schedule 3.21, Company has not assumed, contractually or by operation of Law, any material Environmental Liabilities under any Environmental Laws.

(e)   Neither Company or, to the Knowledge of Company and the Sellers, any of the Leased Premises is subject to any order, decree, injunction or other directive of any Governmental Authority nor has Company received any Environmental Claim that is subject to any agreement with a third party other than a Governmental Authority that may

10176897.8

25

require it to pay to, reimburse, guarantee, pledge, defend, indemnify or hold harmless any Person for or against any Environmental Losses.

(f)     Company and the Sellers have made available to Buyer correct and complete copies of all material environmental investigations, studies, audits, assessments, tests, reports, reviews or other analyses of which it is aware that were conducted by or on behalf of Company and the Sellers in relation to any premises presently or formerly owned, used, leased or occupied by Company.

3.22    Leases.

(a)     Leased Premises.  Schedule 3.22 contains a complete and accurate (i) list of all premises leased by Company for the operation of the Business (the "Leased Premises"), and (ii) a list of all leases related thereto (collectively, the "Leases").

(b)     Leases Binding.  The Leases (i) are valid, binding and enforceable in accordance with their terms and are in full force and effect; (ii) no event of default has occurred which (whether with or without notice, lapse of time or both or the happening or occurrence of any other event) would constitute a default thereunder on the part of Company or the Sellers; and (iii) Company and the Sellers have no Knowledge of the occurrence of any event of default which (whether with or without notice, lapse of time or both or the happening or occurrence of any other event) would constitute a default thereunder by any other party.  The current annual rent and term under each Lease are as set forth on Schedule 3.22.  Schedule 3.22 separately identifies all Leases for which consents or waivers must be obtained on or prior to the Closing Date (or which have been obtained) in order for such Leases to continue in effect according to their terms after the Closing Date.  Company has not waived any material rights under any Lease which would be in effect on or after the date of this Agreement and which would be adverse to Company.  To the Knowledge of Company and the Sellers, no event has occurred which either entitles, or would, on notice or lapse of time or both, entitle the other party to any Lease with Company to declare a default or to accelerate, or which does accelerate, the maturity of any indebtedness of Company under any Lease.

(c)     Improvements and Fixtures.  The Improvements are (i) structurally sound with no known material defects; (ii) in good operating condition and repair, subject to ordinary wear and tear; (iii) not in need of maintenance or repair except for ordinary routine maintenance and repair; and (iv) in conformity with all applicable Laws relating thereto currently in effect.  All of the Improvements on the Leased Premises are located entirely on such Leased Premises.

3.23    No Other Agreement To Sell.  Neither Company nor any of the Sellers has any legal obligation, absolute or contingent, to any other Person to sell, encumber or otherwise transfer Company, the Stock, the Assets or the Business (in whole or in part), or effect any merger, consolidation or other reorganization of Company, or to enter into any agreement with respect thereto.

3.24    Transactions with Certain Persons. Except as set forth on Schedule 3.24, no officer or director of Company nor any member of any such individual's immediate family is presently, or within the past three (3) years has been, a party to any transaction with Company, including without limitation, any Contract or other arrangement (i) providing for the furnishing of services by (other than as officers, directors or employees of Company); (ii) providing for the rental of real or personal property from; or (iii) otherwise requiring payments to (other than for services or expenses as directors, officers or employees of Company in the ordinary course of business consistent with past practice) any such individual or any corporation, partnership, trust or other entity controlled by any such individual. Other than Contracts listed on Schedule 3.24, Company does not have outstanding any Contract or other arrangement or commitment with any Seller or any director, officer, employee, trustee or beneficiary of Company or any Seller that requires payment by Company or requires Company to provide benefits to any such Person and that were not entered into in an arm's-length transaction.

3.25    Disclosure. No representations or warranties by Company or the Sellers set forth in this Agreement (including, without limitation, the Disclosure Schedules hereto), the Transaction Documents or in any document, exhibit, statement, certificate or schedule which is furnished or to be furnished by Company pursuant to Section 9 in connection with the Closing of the transactions herein contemplated, (i) contains or will contain any untrue statement of a material fact, or (ii) omits or will omit to state, when read in conjunction with all of the information contained in this Agreement, the Disclosure Schedules hereto and the other Transaction Documents, any material fact necessary to make the statements or facts contained therein not misleading.

3.26    No Affiliates. Except as set forth on Schedule 3.26, Company does not have any Affiliates, does not own any capital stock or other equity securities of any other corporation and does not have any other type of ownership interest in any other Person.

3.27    Employees. Schedule 3.27 hereto sets forth a complete and accurate list of all employees of Company as of May 1, 2006 showing for each as of such date the employee's name, job title or description, salary level (including any bonus or deferred compensation arrangements other than any such arrangements under which payments are at the discretion of Company) and also showing any bonus, commission or other remuneration other than salary paid during Company's fiscal year ending December 31, 2005, and describing any existing contractual arrangement with such employee (it being understood that all parties do not consider any "at-will" arrangements with employees to be Contracts).

3.28    No Suspension or Debarment. Company has never been suspended or debarred from bidding on contracts or subcontracts for or with the Government. Except as set forth on Schedule 3.28, no suspension or debarment actions with respect to Government Contracts have been commenced, or, to the Knowledge of Company and the Sellers, threatened against Company, the Sellers or any of Company's officers or employees.

3.29    Government Audits. Except as set forth on Schedule 3.29, and except for contract audits of a routine nature, which routine audits, to the Knowledge of Company and the Sellers, would not be reasonably expected to have a Material Adverse Effect on Company,

10176897.8

Company has not received any official notice that it is or was being specifically audited or investigated by the DCAA or the General Accounting Office, nor, to the Knowledge of Company and Sellers, has any such audit or investigation been threatened.

3.30    Labor Relations.    Company is not a party to any collective bargaining agreement or other contract or agreement with any labor organization or other representative of any of the employees of Company and neither Company nor any Seller has any Knowledge of any activities or proceedings of any labor union or other party to organize or represent such employees. There has not occurred or, to the Knowledge of Company and the Sellers, been threatened any strike, slow-down, picketing, work-stoppage, or other similar labor activity with respect to any such employees. Company is in compliance in all material respects with all Laws relating to employment or the workplace, including, without limitation, provisions relating to wages, hours, collective bargaining, safety and health, work authorization, equal employment opportunity, immigration and the withholding of income taxes, unemployment compensation, worker's compensation, employee privacy and right to know and social security contributions. Schedule 3.30 sets forth all unresolved labor controversies (including unresolved grievances and age or other discrimination claims), if any, between Company and Persons employed by or providing services to Company.

3.31    Board Approval.    The Board of Directors of Company has determined that the transactions contemplated by this Agreement are in the best interests of Company and its stockholders. Company and the Sellers have provided Buyer with true and correct copies of all such board of directors proceedings relating to this Agreement and the transactions contemplated hereby, which are in full force and effect as of the date hereof and shall be in full force and effect as of the Closing Date.

3.32    Brokers.    Except for BB&T Capital Markets | Windsor Group, no broker, finder or investment banker or other person is directly or indirectly entitled to any brokerage, finder's or other contingent fee or commission or any similar charge in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Company or any Seller. All such fees, commission or similar charges, including those of the BB&T Capital Markets | Windsor Group, shall be payable and paid by the Sellers from the Closing Purchase Price Payment.

3.33    Government Contracts.

(a)    A true and correct list of each Government Contract which is in effect as of the date of this Agreement and each Government Bid to which Company is a party and for which an award has not been issued 30 days or more prior to the date of this Agreement is set forth in Schedule 3.33(a). On or prior to the Closing Date, Schedule 3.33(a) will be amended by Sellers to include each Government Contract which was entered into by Company between the date of this Agreement and the Closing Date. As amended, Schedule 3.33(a) sets forth a true and correct list of each Government Contract which is in effect as of the Closing Date.

10176897.8

28

(b)    Except as set forth in Schedule 3.33(b):    (A) Company has complied, in all material respects, with the terms and conditions of each Government Contract and Government Bid listed on Schedule 3.33(a) as required; (B) Company has complied in all material respects with the requirements of any Laws pertaining to any such Government Contract or Government Bid; (C) all representations and certifications made by Company with respect to any such Government Contract or Government Bid were accurate in every material respect as of their effective date and Company has fully complied with all such representations and certifications in all material respects; and (D) no termination or default, cure notice or show cause notice has been issued and remains unresolved with respect to any such Government Contract or Government Bid.

(c)    Except as set forth in Schedule 3.33(c): (A) to the Knowledge of the Sellers and Company, none of Company's employees, consultants or agents is (or during the last five years has been) under administrative, civil or criminal investigation or indictment by any Governmental Authority with respect to the conduct of the business of Company; (B) there is no pending or, to the Knowledge of the Sellers and Company, threatened audit or investigation of Company or any of its officers, employees or representatives, nor within the last five (5) years has there been any audit or investigation of Company or any of its officers, employees or representatives resulting in a material adverse finding, with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract or Government Bid; and (C) during the last five (5) years, Company has not made any voluntary disclosure in writing to the Government or any other Governmental Authority with respect to any alleged irregularity, misstatement or omission arising under or relating to a Government Contract or Government Bid.

(d)    Except as set forth in Schedule 3.33(d), there are (A) no outstanding written claims against Company, either by the Government or any other Governmental Authority or by any prime contractor, subcontractor, vendor or other third party arising under or relating to any Government Contract or Government Bid to which Company is a party (excluding claims for payments due in the ordinary course of performance of any such Government Contract or Government Bid), and (B) no written outstanding disputes between Company, on the one hand, and the Government or any other Governmental Authority, on the other hand, under the Contract Disputes Act or any other Federal statute or between Company, on the one hand, and any prime contractor, subcontractor or vendor, on the other hand, arising under or relating to any such Government Contract or Government Bid.

(e)    Company is in compliance in all material respects with all national security obligations, including, without limitation, those specified in the National Industrial Security Program Operating Manual, DOD 5220.22-M (February 28, 2006).

3.34    Absence of Changes.  Except as set forth in Schedule 3.34, since June 1, 2006, (i) Company has conducted its business only in the ordinary and usual course of business consistent with past practice, and (ii) except for matters of general knowledge in the industry related to general economic or industry conditions, there has not been any change in or development with respect to Company's business, operations, condition (financial or otherwise), results of operations, assets or liabilities, except for changes and developments which have not

10176897.8

had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.35    No Additional Representations.  The Sellers and Company acknowledge that neither Buyer, nor any other Person acting on behalf of Buyer, nor any Affiliate of Buyer has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Buyer, except as expressly set forth in this Agreement, the Transaction Documents and the Disclosure Schedules.

## 4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Company and the Sellers the following matters, current as of the date of this Agreement and as of the Closing Date:

4.1    Organization.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to carry on its business as now conducted and to enter into and perform this Agreement.

4.2    Corporate Authorization.  Buyer has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and Buyer's consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate action of Buyer.

4.3    Binding Agreement.  This Agreement has been duly executed by Buyer and delivered to Company and the Sellers and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally and the exercise of judicial discretion in accordance with general equitable principles.  Upon execution and delivery thereof at the Closing by Buyer, each Transaction Document to which Buyer is, or is specified to be, a party will be duly and validly executed by Buyer and delivered to Company and the Sellers on the Closing Date, and will constitute (assuming, in each case, the due authorization, execution and delivery by each other party thereto) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally and the exercise of judicial discretion in accordance with general equitable principles.

4.4    No Breach.  Subject to the necessity of obtaining approvals, or termination or expiration of the waiting period, under the HSR Act, the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby by Buyer do not and will not (i) violate or conflict with Buyer's Certificate of Incorporation or Bylaws; or any Laws of any Governmental Authority to which Buyer is subject, or by which Buyer may be bound, (ii) (with or without giving notice or

the lapse of time or both) breach or conflict with, constitute or create a default or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any contract, agreement, or other commitment to which Buyer is a party or by which Buyer is bound, or (iii) require any filing with, or permit, consent or approval of, or the giving of notice to, any Governmental Authority or third party.

      4.5    Litigation; Compliance with Law.   There is no litigation, proceeding (arbitral or otherwise), claim, action, suit, judgment, decree, settlement, rule, order or investigation of any nature, pending, rendered or, to Buyer's Knowledge, threatened, against Buyer that reasonably could be expected to affect Buyer's ability to consummate the transactions contemplated by this Agreement.

      4.6    Solvency; Ability to Perform Agreement.   On the Closing Date, Buyer will have available funds necessary to pay the Purchase Price.  Buyer will not become insolvent as a result of consummating the transactions contemplated by this Agreement.

      4.7    Investment Intent.   Buyer is acquiring the Stock for its own account and not with a view to its distribution within the meaning of Section 2(11) of the Securities Act of 1933, as amended, and the rules and regulations issued pursuant thereto.

      4.8    Buyer's Acknowledgement Regarding Forward-Looking Statements. Buyer acknowledge that (a) neither Company nor the Sellers nor any of Company's Representatives makes or shall be deemed to have made hereunder any representations or warranties, express or implied, at law or in equity, of any kind or nature whatsoever concerning or as to the accuracy or completeness of any projections, budgets, forecasts or other forward-looking financial information concerning the future revenue, income, profit or other financial results of Company, (b) there are uncertainties inherent in attempting to make any such projections, budgets, forecasts or other forward-looking financial information, and (c) actual results of operations may differ materially from any such projections, budgets, forecasts or other forward-looking financial information.

      4.9    Brokers.   No broker, finder or investment banker or other person is directly or indirectly entitled to any brokerage, finder's or other fee or commission or any similar charge in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

      4.10    Board Approval. The Board of Directors of Buyer has adopted resolutions authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.  Buyer has provided the Sellers and Company with true and correct copies of all such board of directors proceedings relating to this Agreement and the transactions contemplated hereby, which are in full force and effect as of the date hereof and as of the Closing Date.

      4.11    No Additional Representations.   Buyer acknowledges that none of Company, the Sellers, nor any other Person acting on behalf of Company or the Sellers, nor any Affiliate of Company or the Sellers has made any representation or warranty, express or implied,

10176897.8

regarding Company or the Sellers, except as expressly set forth in this Agreement, the other Transaction Documents and the Disclosure Schedules.

## 5.    COVENANTS

Between the date of this Agreement and the Closing Date (except for the covenants set forth in <u>Section 5.8</u>, which shall apply at all times, and <u>Sections 5.15</u> through <u>5.17</u>, which shall only apply following the Closing Date in accordance with their terms):

5.1    <u>Affirmative Covenants of Company and the Sellers</u>.  Company and each of the Sellers hereby covenants and agrees that, from the date hereof through and including the Closing Date, unless otherwise expressly contemplated by this Agreement or consented to in writing by Buyer, Company shall, and the Sellers shall take all actions within their control to cause Company to:

(a)    operate the Business in the usual and ordinary course consistent with past practice;

(b)    use its reasonable best efforts to preserve substantially intact its business organization, maintain its rights and ongoing operations, retain the services of its respective officers and key employees and maintain its relationship with its respective officers and key employees and maintain its relationship with its respective customers and suppliers;

(c)    use its reasonable best efforts to maintain and keep its properties and assets in as good repair and condition as at present, ordinary wear and tear excepted;

(d)    use its reasonable best efforts to keep in full force and effect insurance comparable in amount and scope of coverage to that currently maintained; and

(e)    operate its business in all material respects in compliance with all applicable Laws.

5.2    <u>Negative Covenants of Company and the Sellers</u>.  Except as expressly contemplated by this Agreement and except as set forth in <u>Schedule 5.2</u> or otherwise consented to in writing by Buyer (which consent shall not be unreasonably delayed or withheld), from the date hereof until the Closing Date, Company shall not do, and the Sellers shall take all actions within their control to cause Company not to do, any of the following:

(a)    (i) increase the compensation or benefits to or to become payable to any of its current or former directors, officers or employees, except for increases in salary or wages payable or to become payable to employees who are not officers or directors in the ordinary course of business and consistent with past practice, which increases shall not in the aggregate for all such employees exceed 5% of the salary or wages payable to all such employees as of the date hereof; (ii) grant any severance or termination pay (other than required by existing severance arrangements or policies as in effect on the date of this Agreement) to, or enter into or modify any employment or severance agreement with, any of its current or former directors, officers or employees; (iii) adopt, terminate or amend any employee benefit plan,

10176897.8

32

policy or arrangement; or (iv) grant any equity or equity-based compensation, in each case except as may be required by applicable Law;

(b)    (i) redeem, repurchase or otherwise reacquire any shares of its capital stock or any securities or obligations convertible into or exchangeable for any shares of its capital stock, or any options, warrants or conversion or other rights to acquire any shares of its capital stock or any such securities or obligations; (ii) effect any reorganization or recapitalization; or (iii) split, combine or reclassify any of its capital stock or issue or authorize or propose the issuance of any other securities in respect of, in lieu of, or in substitution for, shares of its capital stock;

(c)    issue, pledge, deliver, award, grant or sell, or authorize or propose the issuance, pledge, delivery, award, grant or sale (including the grant of any encumbrances) of, any shares of any class of its capital stock (including shares held in treasury), any securities convertible into or exercisable or exchangeable for any such shares, or any rights, warrants or options to acquire, any such shares;

(d)    (i) acquire or agree to acquire, merge or consolidate with, by purchasing an equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets of any other Person or (ii) make or commit to make any investments other than short-term liquid investments, investments that will be liquidated prior to the Closing, or other investments that do not exceed $100,000 in the aggregate for all such other investments that occur from the date hereof;

(e)    sell, lease, exchange, mortgage, pledge, transfer or otherwise dispose of, or agree to sell, lease, exchange, mortgage, pledge, transfer or otherwise encumber or dispose of, any of its assets (including the Assets), except for dispositions of Assets that are in the ordinary course of business and consistent with past practice which do not exceed $100,000 in the aggregate;

(f)    propose or adopt any amendments to its Articles of Incorporation or its Bylaws;

(g)    make any change in any of its methods of accounting or make any reclassification of assets or liabilities, except as may be required by Law or GAAP, or any change with respect to the payment of accounts payable or the collection of accounts receivable;

(h)    incur or guarantee any obligation for borrowed money, whether or not evidenced by a note, bond, debenture or similar instrument, or enter into any "keep well" or other agreement to maintain the financial condition of another Person or make any loans, or advances of borrowed money or capital contributions to, or equity investments in, any other Person or issue or sell any debt securities, other than purchase money indebtedness not to exceed $100,000 in the aggregate, except in the ordinary course of business consistent with past practice under existing loan agreements or capitalized leases;

10176897.8

33

(i)    transfer to any Person any material rights to Company IP other than in the ordinary course of business consistent with past practice;

(j)    create or incur any Liens on the Assets or the Stock, except for Permitted Liens;

(k)    except in the ordinary course of business consistent with past practice, enter into or amend any agreements pursuant to which any other party is granted exclusive marketing or other exclusive rights of any type or scope with respect to any products or technology of Company;

(l)    enter into any operating lease with an aggregate value in excess of $100,000;

(m)    make any capital expenditures, capital additions or capital improvements other than (i) expenditures for routine or emergency maintenance and repair in an amount not to exceed $100,000, or (ii) expenditures in the ordinary course of business consistent with past practice in amounts not exceeding $100,000 in the aggregate;

(n)    enter into or amend any Lease, Contract, commitment, understanding or other arrangement in each case involving annual expenditures or liabilities in excess of $100,000 (or, in the case of Government Contracts, involving annual expenditures or liabilities in excess of $1,000,000) or which is not cancelable within six months without penalty, cost or liability or which is otherwise material to Company; provided, that all such permitted new Contracts or Leases shall be deemed to be included within the term "Contracts" as defined in Section 1 hereof;

(o)    submit any new Government Bid which, if accepted, (i) is expected to result in a loss to Company or (ii) would result in a Government Contract with a backlog value in excess of $2,000,000;

(p)    enter into any collective bargaining agreement;

(q)    make or change any Tax election, change any annual Tax accounting period, change any method of Tax accounting, enter into any closing agreement with respect to any Tax, settle any Tax claim or any assessment or surrender any right to claim a Tax refund;

(r)    pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), except the payment, discharge or satisfaction of (i) liabilities or obligations in the ordinary course of business consistent with past practice or in accordance with the terms thereof as in effect on the date hereof or (ii) claims settled or compromised to the extent permitted by Section 5.2(s), or waive, release, grant or transfer any rights of material value or modify or change in any material respect any existing Contract, in each case, other than in the ordinary course of business consistent with past practice;

10176897.8

34

(s)    settle or compromise any litigation, other than litigation in an aggregate amount not in excess of $100,000; provided, that such settlement documents related to any such settlement do not involve any material non-monetary obligations on the part of Company or Buyer;

(t)    make any payment to an Affiliate, except (i) dividends or distributions to the Sellers, (ii) in accordance with the terms of any Contract in the ordinary course of business consistent with past practice, (iii) compensation to employees in the ordinary course of business or (iv) in accordance with Section 5.2(a); or

(u)    intentionally take, or offer or propose to take, or agree to take in writing or otherwise, any of the actions described in Section 5.2 which require the consent of Buyer or any action which would result in any of the conditions set forth in Section 6 not being satisfied.

5.3    Adverse Developments.  Company and the Sellers shall promptly notify Buyer of any Material Adverse Effect with respect to Company.

5.4    Potential Breach.  Each party will promptly notify the other parties of the occurrence of any event, or the existence of any fact, of which such party becomes aware that results in the inaccuracy in any material respect of any representation or warranty of such party in this Agreement as of any time prior to the Closing, and such party will use its reasonable best efforts to cure such matter.

5.5    Access.  Company will provide, and the Sellers shall cause Company to provide, Buyer and its counsel, accountants, financing sources and other representatives ("Buyer's Representatives") with access to the books and records of Company and the Business, to the Assets and, subject to the receipt of reasonable prior notice from Buyer and with the consent of the President of Company or her authorized designee (which consent will not be unreasonably withheld or delayed), to the officers, employees, agents and accountants of Company with respect to matters relating to the Business and will provide Buyer and Buyer's Representatives with such information concerning Company, the Stock, the Assets and the Business as Buyer and/or Buyer's Representative reasonably may request; provided, however that Buyer shall not contact any customer of Company for the purpose of discussing with such customer the business and affairs of Company or the transactions contemplated hereby without the prior express consent of the President of Company or her authorized designee.

5.6    Financial Statements.  Between the date of this Agreement and the Closing Date, as soon as the same are available, Company will provide, and the Sellers shall cause Company to provide, Buyer with copies of the regularly prepared financial statements of Company.

5.7    No Negotiations.  Company and the Sellers shall, and shall cause their respective Representatives, to immediately cease any existing discussion or negotiation with any Persons (other than Buyer) conducted prior to the date hereof with respect to any proposed, potential or contemplated acquisition of the Stock, the Assets or Company.  Company and the

10176897.8

35

Sellers will refrain, and will cause each of their respective Representatives to refrain, from taking, directly or indirectly, any action (i) to solicit or initiate the submission of any proposal or indication of interest relating to an acquisition of the Stock, the Assets or Company with any Person (other than Buyer), (ii) to participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or that may reasonably be expected to lead to, an acquisition of the Stock, the Assets or Company (or any proposal or indication of interest relating thereto) with any Person (other than Buyer), (iii) to authorize, engage in, or enter into any agreement or understanding (other than with Buyer) with respect to an acquisition of the Stock, the Assets or Company (or any proposal or indication of interest relating thereto) or (iv) to merge, consolidate, or combine, or to permit any other Person to merge, consolidate or combine, with Company.

    5.8   Confidentiality.

    (a)    Buyer, Company and the Sellers shall each keep confidential and not directly or indirectly reveal, report, publish, disclose or transfer any information obtained by each with respect to the other in connection with this Agreement and the negotiations preceding this Agreement, including, without limitation, the amount of the Purchase Price (the "Confidential Information"), other than to its Representatives, and each will use such Confidential Information solely in connection with the transactions contemplated by this Agreement, and if the transactions contemplated hereby are not consummated for any reason, each shall return to the other, without retaining any copies thereof, any schedules, documents or other written information obtained from the other in connection with this Agreement and the transactions contemplated hereby and shall cause all of its Representatives to whom it may have disclosed such Confidential Information to do the same. Notwithstanding the foregoing limitations, no party to this Agreement shall be required to keep confidential or return any Confidential Information that (i) is known or available through other lawful sources not bound by a confidentiality agreement with the disclosing party; (ii) is or becomes publicly known or generally known in the industry through no fault of the receiving party or its agents; (iii) is developed by the receiving party independently of the disclosure by the disclosing party; (iv) is requested or required to be disclosed pursuant to Law (including securities laws of any jurisdiction and rules and regulations of any applicable stock exchange), provided the other parties are given reasonable prior notice or consent thereto; or (v) relates solely to the income tax aspects and consequences of the transactions contemplated by this Agreement.

    (b)    Following the Closing, none of the Sellers shall, and the Sellers shall use their best efforts to cause their Representatives not to, at any time, make use of, divulge or otherwise disclose, directly or indirectly, any Company IP or other proprietary data (including, but not limited to, any customer list, record or financial information) concerning Company or the Business that any such Seller or Representative of such Seller may have learned as a shareholder, employee, officer, director of Company or Representative of such Seller. In addition, none of the Sellers shall, and the Sellers shall use their best efforts to cause their Representatives not to, make use of, divulge or otherwise disclose, directly or indirectly, to Persons other than Buyer, any confidential information concerning Company or the Business and which may have been learned in any such capacity. The foregoing limitations shall not apply to any use or disclosure of Company IP or other proprietary data to the extent its use or disclosure is (i) necessary in the

10176897.8

36

performance of any obligations under this Agreement or in the continued performance of services to Company by the Sellers as employees or consultants to Company, (ii) used to secure the full benefits under this Agreement, including, without limitation, with respect to Base Purchase Price adjustments, (iii) used or disclosed in the course of post Closing tax filings, or (iv) used or disclosed in connection with any defense of any indemnification claim made by any Indemnified Party. This provision shall not prohibit the Sellers from making any disclosure that is requested or required pursuant to Law, provided the other parties are given reasonable prior notice or consent thereto.

5.9    No Inconsistent Action. None of Buyer, Company or the Sellers shall take any action which is materially inconsistent with its obligations under this Agreement, that would cause any representation to be untrue or misleading, that would make it impossible or impracticable for a condition herein to be satisfied, or that would materially hinder or delay the consummation of the transactions contemplated by this Agreement.

5.10    Permits. Company and the Sellers shall maintain all Permits that continue to be necessary in order for Company to own the Assets and continue to conduct the Business as it is then conducted in full force and effect, and will file timely, all reports, statements, renewals applications and other filings that are required to keep such Permits in full force and effect, and will pay timely all fees and charges in connection therewith that are required to keep the Permits in full force and effect.

5.11    HSR Act Matters. In the event filings pursuant to the HSR Act are required to consummate the transactions contemplated hereby, the parties promptly will use reasonable best efforts to complete a Notification and Report Form under the HSR Act and, not later than ten (10) business days after the date hereof, together with the Persons, if any, who are required to join in such filing, shall file such documents with the appropriate Governmental Authorities. The parties shall use their reasonable best efforts to obtain early termination of the applicable waiting period under the HSR Act. The parties shall promptly furnish all materials thereafter reasonably required by any of the Governmental Authorities having jurisdiction over such filings, and shall take all reasonable actions and shall file and use all reasonable efforts to have declared effective or approved all documents and notifications with any such Governmental Authority, as may be required under the HSR Act or other federal or state antitrust laws for the consummation of the transactions contemplated hereby. However, nothing contained in this Agreement will require Buyer or any of its Affiliates to enter into any agreement, consent decree or other commitment requiring Buyer or any of its Affiliates to (x) divest or hold separate any assets of Company, Buyer or any of their Affiliates, (y) litigate, pursue or defend any action or proceeding challenging any of the transactions contemplated hereby as violative of any antitrust laws or (z) take any other action that would, individually or in the aggregate, materially adversely affect Buyer or any of its Affiliates. In connection with the foregoing, each party (i) will promptly notify the other parties in writing of any communication received by that party or its Affiliates from any Governmental Authority having jurisdiction over such filings, and subject to applicable Law, provide the other parties with a copy of any such written communication (or written summary of any oral communication), and (ii) will not participate in any substantive meeting or discussion with any Governmental Authority having jurisdiction over such filings concerning the transactions contemplated by this Agreement unless it consults with the other

party in advance, and to the extent permitted by such Governmental Authority, gives a Representative of the other parties the opportunity to attend. Buyer shall pay all filing fees related to compliance with the HSR Act in connection with transactions contemplated hereby. Each party shall be responsible for its respective preparation costs and other expenses (including attorneys' fees) in connection therewith.

     5.12    Employees.

     (a)    All severance payments for employees of Company whose employment will cease as of or prior to Closing and all bonus payments (including any change of control and retention incentive payments) for employees of Company due and payable on or before Closing, including, but not limited to, all bonus payments set forth on Schedule 5.12, shall be paid by Company on or prior to the Closing Date and, if required, the Sellers shall make appropriate arrangements to enable Company to make such payments out of the Closing Purchase Price Payment.

     (b)    Employees of Company who continue to be employed by Buyer, Company or any of its Affiliates following the Closing will be given full credit for their years of service with Company before the Closing for purposes of vesting and eligibility to participate in Benefit Plans, leave and programs of Buyer and its Affiliates that are made available to such employees after the Closing. Buyer agrees to maintain levels of employee benefits (other than equity-based benefits) for at least twelve (12) months following the Closing that are, in the aggregate, no less favorable than those provided by Company prior to the Closing.

     (c)    Nothing in this Section 5.12, express or implied, is intended to confer on any person other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Section 5.12.

     5.13    Further Action; Efforts.

     (a)    Each of the parties shall use all reasonable best efforts to take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws or otherwise to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including, without limitation, using all reasonable efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Authorities and parties to Contracts with Company as are necessary for the consummation of transactions contemplated herein; provided, however, that notwithstanding the foregoing, Company and the Sellers shall use their commercially reasonable best efforts at their sole expense to obtain each consent, approval, Permit or waiver listed on Schedule 3.6 (other than any approval under the HSR Act), Schedule 3.13 and Schedule 3.22, and Buyer agrees to reasonably cooperate in such efforts. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each party to this Agreement and the proper officers and directors of such party shall use all reasonable best efforts to take all such action.

(b)     During the period after the date hereof but prior to the Closing (the "Interim Period"), each of the parties shall promptly notify the others in writing of any pending or, to the Knowledge of such party, threatened action, proceeding or investigation by any Governmental Authority or any other Person (i) challenging or seeking damages in connection with the transactions contemplated hereby or (ii) seeking to restrain or prohibit the consummation of the transactions contemplated hereby or otherwise limit the right of Buyer to own or operate all or any portion of the Business, the Assets or Company.

(c)     During the Interim Period, Company and the Sellers shall be entitled to update the Disclosure Schedules to the extent information contained therein becomes untrue or incomplete or inaccurate after the date hereof due to events occurring after the date hereof, other than as a result of a breach by Company or any of the Sellers of the representations and warranties as of the date hereof or covenants contained herein. If such update discloses a Material Adverse Effect with respect to Company, taken as a whole, Buyer may terminate this Agreement. If such update does not disclose a Material Adverse Effect with respect to Company, taken as a whole, Buyer may not terminate this Agreement pursuant to this Section 5.13(c).

5.14     Releases. The parties agree that, as part of the Closing, each Seller, on the one hand, and Company, on the other hand, will execute and deliver mutual general releases in a form reasonably satisfactory to the parties hereto.

5.15     Non-Competition Agreements. Carol A. Trawick and James R. Trawick will each execute a non-competition agreement with restrictions for a five (5) year period from the Closing, the form of which is attached as Exhibit A-1. Mark E. Kleckner and Gary H. Brown will each execute a non-competition agreement with restrictions for a three (3) year period from the Closing, the form of which is attached as Exhibit A-2. All other key employees of Company will execute a non-competition agreement in the form of Exhibit A-3.

5.16     Tax Returns.

(a)     The Sellers shall prepare or cause to be prepared and timely file, and Company and Buyer shall cooperate with the Sellers in the preparation and timely filing of, all Tax Returns required to be filed by or on behalf of Company after the Closing Date for periods ending on or prior to the Closing Date. No later than ten (10) days prior to filing, the Sellers shall deliver to Buyer all such Tax Returns and shall permit Buyer to review and comment on each such Tax Return and shall make such revisions to such Tax Returns as are reasonably requested by Buyer, if received at least five (5) days prior to filing. The Sellers shall include any income, gain, loss, deduction, or other Tax item resulting from the Election on such Tax Returns to the extent permitted by applicable Law. In addition to any other Taxes shown as due on the Tax Returns, the Sellers shall pay (or promptly reimburse Buyer for) any Tax imposed on Company attributable to the making of the Election, including, but not limited to, (i) any Tax imposed under Code Section 1374 and (ii) any state or local Tax imposed on Company resulting from the Election (less the Gross-Up Amount, the payment obligation of which is being assumed and paid by Buyer as provided in Section 5.17(f)).

(b)    Company and Buyer shall prepare or cause to be prepared all Tax Returns of Company for periods commencing after the Closing Date and taxable periods which include (but do not end on) the Closing Date and shall be responsible for paying any Taxes shown as due on such Tax Returns except for Taxes with respect to which the Sellers are responsible, which shall be promptly reimbursed by the Sellers to Buyer or Company. If any Tax shown as due on any Tax Return referred to in the prior sentence is required to be borne by the Sellers (taking into account indemnification obligations hereunder and adjustments to the Purchase Price) or affects taxable income reportable by the Sellers by reason of their former ownership of the Stock, such Tax Return shall be prepared in a manner consistent with the prior practice of Company unless otherwise required by applicable Tax Laws; a draft of each such Tax Return shall be provided to the Sellers for review and comment not later than ten (10) days prior to filing (or, if required to be filed within thirty (30) days of the Closing, as soon as possible following the Closing).

(c)    The parties shall, unless prohibited by applicable Law, cause the taxable period of Company to end as of 11:59 p.m. local time on the Closing Date. For the avoidance of doubt, the parties hereto agree that the taxable year of Company, as a subchapter S corporation, shall terminate and end at the end of the Closing Date for federal income tax purposes (and to the extent applicable, for state and local tax purposes as well), and that all items of income, gain, deduction, or loss recognized after the Closing Date shall be included by Company and Buyer in Buyer's consolidated federal income Tax Return (and to the extent applicable, in Buyer's Tax Return for state and local tax purposes as well). For purposes of this Agreement, Taxes incurred by Company with respect to a taxable period that includes but does not end on the Closing Date, shall be allocated to the portion of the taxable period ending on the Closing Date (i) except as provided in (ii) and (iii) below, to the extent feasible, on a specific identification basis, according to the date of the event or transaction giving rise to the Tax, and (ii) except as provided in (iii) below, with respect to periodically assessed ad valorem Taxes and Taxes not otherwise reasonably allocable to specific identifiable transactions or events or dates, in proportion to the number of days in such taxable period that occur on or before the Closing Date compared to the total number of days in such taxable period, and (iii) in the case of any Tax based upon or related to income or receipts, in an amount equal to the Tax which would be payable if the relevant taxable period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of Company.

5.17    <u>Cooperation on Tax Matters.</u>

(a)    Buyer, Company and the Sellers (at no expense to the Sellers) shall cooperate fully, as and to the extent reasonably requested by the other parties, in connection with the filing of Tax Returns pursuant to <u>Sections 5.16</u> and <u>5.17</u> and any audit, litigation or other proceeding with respect to Taxes. Company agrees to (i) retain all books and records with respect to Tax matters pertinent to Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or the Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) give the other parties reasonable written notice prior to transferring, destroying or discarding any such books and

10176897.8

40

records and, if the other parties so request, Company shall allow the other parties to take possession of such books and records.

(b)    Except in connection with an audit resolved pursuant to Section 5.17(c) (including consistent correlative adjustments to Tax Returns for non-audited taxable periods), no party may amend a Tax Return filed by any party with respect to Company or file or amend any Tax election of Company, in each case, for a taxable period beginning prior to the Closing Date, without the consent of the other parties hereto, not to be unreasonably withheld or delayed. Buyer shall, upon request by the Sellers and at their sole expense, cooperate in the preparation of and submission to the proper taxing authority of any such amended Tax Return which is required to cause such Tax Return to be consistent with adjustments to the Tax Returns of Company for any other taxable period proposed by any taxing authority, or to give effect to an allowable loss carryback or carryover from a taxable period of Company ending on or before the Closing Date.

(c)    Any party who receives any notice of a pending or threatened Tax audit, assessment, or adjustment relating to Company, or the Sellers with respect to Company, which may give rise to liability of another party hereto, shall promptly notify Buyer and the Sellers within ten (10) business days of the receipt of such notice. The parties each agree to consult with and to keep the other parties hereto informed on a regular basis regarding the status of any Tax audit or proceeding to the extent that such audit or proceeding could affect a liability of such other parties (including indemnity obligations hereunder). The Sellers shall have the right to represent Company's interests in any Tax audit or administrative or judicial proceeding and to employ counsel of the Sellers' choice, but reasonably satisfactory to Buyer, at their expense, but only to the extent such audit or other proceeding pertains to taxable periods ending on or before the Closing Date. Buyer shall have the right to participate in such proceeding at its own expense, and shall be entitled to control the disposition of any issue involved in such proceeding which does not affect a potential liability of the Sellers. Buyer and the Sellers shall be entitled to represent their own interests in light of their responsibilities (including indemnity obligations) for the related Taxes, at their own expense, in any audit or administrative or judicial proceedings involving a taxable period that includes but does not end on the Closing Date. Notwithstanding the foregoing, the Sellers shall not agree to any settlement for any Taxable period that would affect Tax liabilities of Buyer or Company for any Taxable period beginning on or after the Closing Date without prior written consent of Buyer.

(d)    Buyer and the Sellers shall jointly make an election provided for by Section 338(h)(10) of the Code and Section 1.338(h)(10) of the Treasury regulations (and any comparable election under state or local laws) (collectively, the "Election") with respect to the acquisition of the Stock. The Election shall be made prior to the unextended filing deadline of the Tax Returns described in Section 5.16(a). The Purchase Price shall be allocated among the assets of Company based upon the fair market value of the assets of Company at the time of Closing for purposes of completing all forms of any nature necessary to effectuate the Election (including, but not limited to, Internal Revenue Service Form 8023, Election under Section 338 for Corporations Making Qualified Stock Purchases, Form 8883, Asset Allocation Statement, and any similar forms under applicable state or local law) (the "Section 338 Forms") in accordance with applicable U.S. Treasury regulations. The allocation of the Purchase Price shall

10176897.8

41

be preliminarily, jointly agreed to by Buyer and the Sellers on or prior to the Closing Date, subject to post-Closing adjustment to reflect the operations of Company through the Closing Date. Based on such allocation, Buyer and the Sellers shall jointly prepare the Section 338 Forms and Buyer, the Sellers and Company shall execute and deliver the Section 338 Forms to one another for filing. Company and Buyer shall duly and timely file the Section 338 Forms in accordance with applicable Tax Laws and in accordance with this Agreement. Company and Buyer shall report the acquisition by Buyer of the Stock pursuant to this Agreement consistent with the Elections and shall take no position contrary thereto or inconsistent therewith in any Tax Return, any discussion with or proceeding before any taxing authority, or otherwise. Buyer agrees to provide the Sellers as promptly as possible after the Closing Date written instructions in accordance with applicable Law as to what is necessary to file a timely, valid Election. The Sellers agree to comply with such reasonable instructions.

(e)     Buyer and the Sellers further agree, upon request, to use their reasonable efforts (without expense to the Sellers) to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, without limitation, with respect to the transactions contemplated hereby).

(f)     Buyer and the Sellers agree that the payment obligation of the Sellers being assumed by Buyer as a result of Buyer's decision to make the Election is Three Million Dollars ($3,000,000) (the "Gross-Up Amount"), which shall be in full consideration for any and all additional state and federal Taxes incurred by the Sellers and Company (including any Code Section 1374 Tax) as result of the Election. The payment of the Gross-up Amount shall be made by Buyer assuming the liability for Tax under Code Section 1374 and any state or local Tax imposed on Company as a result of the Election in the amount of the Gross-Up Amount and causing Company to timely pay such Tax in the amount of the Gross-Up Amount.

(g)     Buyer covenants that it will not and will not cause or permit Company or any Affiliate of Buyer to (i) take any action on the Closing Date other than in the ordinary course of business, including, without limitation, the distribution of any dividend or the effectuation of any redemption which would result in any Tax liability to the Sellers, or (ii) make any election or deemed election under Section 338 of the Code on the Closing Date other then the Election or amend any Tax Return of Company on the Closing Date.

5.18     Indebtedness. Company shall pay, and the Sellers shall cause Company to pay, all outstanding Indebtedness on or prior to the Closing Date.

## 6.     CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to consummate this Agreement and the Closing of the transactions contemplated hereunder are subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

6.1     Representations and Warranties. The representations and warranties of Company and the Sellers to Buyer contained herein (and in any certificates delivered by

10176897.8

42

Company and the Sellers pursuant hereto) that are qualified by materiality (including, without limitation, by a Material Adverse Effect qualifier) shall be true and correct in all respects and the representations and warranties of Company and the Sellers to Buyer contained herein (and in any certificates delivered by Company and the Sellers pursuant hereto) that are not so qualified by materiality (including, but not limited to, a Material Adverse Effect qualifier) will be true and correct in all material respects (in each case, subject to all qualifications as to Knowledge set forth in those representations and warranties) as of the date hereof and as of the Closing Date, in each case, as if made again on and as of the Closing Date, and Company and the Sellers shall deliver to Buyer a certificate attesting to the same.

6.2  _Compliance with Covenants._  All of the covenants to be complied with and performed by Company and the Sellers on or before the Closing Date shall have been duly complied with and performed in all material respects, and Company and the Sellers shall deliver to Buyer a certificate attesting to the same.

6.3  _Closing Documents._  On the Closing Date, Company and/or the Sellers shall have delivered or caused to be delivered to Buyer the duly executed closing documents as specified in Section 9.1 hereof.

6.4  _Receipt of Third Party Consents._  For each of the Contracts and Leases for which the consent, Permit, waiver or other approval of, or giving of notice to, a third party is required in order for such Contract or Lease, as the case may be, to continue in effect according to its terms (including, without limitation, those listed on Schedule 3.9, Schedule 3.13 or Schedule 3.22 hereto), Company and the Sellers shall have obtained all required consents, Permits, waivers or other approvals of, or have given any required notice to, any such third parties without modification of any material provision of any such Contract or Lease.

6.5  _Governmental Consents, Approvals and Waivers._  The parties shall have received any consents, Permits, approvals and waivers of any Governmental Authority required in order for the parties to consummate the transactions contemplated hereby, including any necessary approval, or the termination or expiration of any waiting period, under the HSR Act.

6.6  _Absence of Litigation._  As of the Closing, no Law shall have been adopted, promulgated, entered, enforced or issued by any Governmental Authority, or other action, claim, suit or proceeding instituted by a Governmental Authority seeking to enjoin, restrain, or prohibit the consummation of this Agreement, having the effect of making illegal or otherwise prohibiting the transactions contemplated hereby shall be pending before any court or any other Governmental Authority; _provided_, however, that this condition may not be invoked by Buyer if any such action, suit or proceeding was the result of any act or omission by Buyer.

6.7  _No Material Adverse Effect._  Since December 31, 2005, there shall not have been any Material Adverse Effect with respect to Company.

6.8  _No Indebtedness; Release of Liens._  Company shall have no Indebtedness. All Liens on the Stock and all Liens on the Assets (other than any Liens on the Assets listed on Schedule 3.9) shall have been released and removed.

10176897.8

43

6.9   Execution of Non-Competition and Non-Disclosure Agreements. Company shall have entered into a non-competition and non-disclosure agreement, substantially in the form of Exhibits A-1, A-2 and A-3 attached hereto (the "Non-Competition Agreements"), with each of the Sellers and the officers and other key employees of Company as identified on Schedule 6.9.

6.10   Excluded Assets. Company shall have transferred or disposed of the Excluded Assets and related liabilities, all in a manner and pursuant to agreements reasonably satisfactory to Buyer.

6.11   CSC Subcontract. On the Closing Date, Company shall have available Cash and/or CSC Related Accounts Receivable in an aggregate amount equal to the total amount of the CSC Accrued Expenses that remain accrued and unpaid on the Closing Date and the Sellers shall have delivered to Buyer evidence, reasonable satisfactory to Buyer, showing that such Cash and/or CSC Related Accounts Receivable are available.

6.12   Minimum EBITDA. Company shall have delivered to Buyer, as soon as available, (i) the unaudited balance sheet and statement of income for Company as of July 31, 2006 and for the period from January 1 to July 31, 2006 and (ii) a calculation of EBITDA for the twelve (12) month period ended on July 31, 2006, adjusted in accordance with the methodology used to calculate EBITDA for the twelve (12) month period ended June 30, 2006 as set forth on Schedule 3.15. If EBITDA of Company for the twelve (12) month period ended on July 31, 2006, calculated as noted above, is less than Eight Million Dollars ($8,000,000), then Buyer may, upon written notice to the Sellers Representative delivered within two (2) days from delivery to Buyer of the EBITDA calculation for the twelve (12) month period ended July 31, 2006, terminate this Agreement. If Buyer does not terminate this Agreement within such two day period, Buyer shall be deemed to have waived this condition, and to have waived its right to terminate under this Section 6.12.

## 7.   CONDITIONS TO COMPANY'S AND SELLERS' OBLIGATIONS

The obligations of each of Company and Sellers to consummate this Agreement and Closing of the transaction contemplated hereunder are subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

7.1   Representations and Warranties. The representations and warranties of Buyer to Company and Sellers contained herein (and in any certificates delivered by Buyer pursuant hereto) that are qualified by materiality (including, but not limited to, by a Material Adverse Effect qualifier) will be true and correct in all respects and the representations and warranties of Buyer to Company and Sellers contained herein (and in any certificates delivered by Buyer pursuant hereto) that are not so qualified by materiality (including, but not limited to, by a Material Adverse Effect qualifier) will be true and correct in all material respects (in each case, subject to all qualifications as to Knowledge set forth in those representations and warranties) as of the Closing Date, in each case, as if made again on and as of the Closing Date, and Buyer shall deliver to Company and the Sellers a certificate attesting to the same.

7.2    <u>Compliance with Covenants</u>. All of the covenants to be complied with or performed by Buyer on or before the Closing Date shall have been duly complied with and performed in all material respects.

7.3    <u>Closing Documents</u>. On the Closing Date, Buyer shall have delivered to Company and/or the Sellers duly executed closing documents, as specified in <u>Section 9.2</u> below.

7.4    <u>Governmental Consents and Waivers</u>. The parties shall have received any consents, Permits, approvals and waivers of any Governmental Authority required in order for the parties to consummate the transactions contemplated hereby, including any necessary approval, or the termination or expiration of any waiting period, under the HSR Act.

7.5    <u>Absence of Litigation</u>. As of the Closing, no Law shall have been adopted, promulgated, entered, enforced or issued by any Governmental Authority, or other action, claim, suit or proceeding instituted by a Governmental Authority seeking to enjoin, restrain, or prohibit the consummation of this Agreement, having the effect of making illegal or otherwise prohibiting the transactions contemplated hereby shall be pending before any court or any other Governmental Authority; <u>provided</u>, however, that this condition may not be invoked by the Sellers if any such action, suit or proceeding was the result of any act or omission by the Sellers.

7.6    <u>Payment</u>. At the Closing, Buyer shall deliver to the Sellers the Closing Purchase Price Payment, by delivery of the promissory notes as provided in <u>Section 2.2(a)</u>.

**8.    CLOSING**

8.1    <u>Timing</u>. Subject to the satisfaction or waiver of the conditions to closing set forth in <u>Sections 6</u> and <u>7</u>, the closing of the purchase and sale of the Stock (the "<u>Closing</u>") shall take place on such date and at such time as mutually agreed upon by the parties; <u>provided</u>, that in no event shall the Closing occur later than October 31, 2006 (the "<u>Closing Date</u>"). The Closing shall occur at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 or such other place as Buyer and the Sellers may agree in writing. By mutual agreement of the parties, the Closing may take place by conference call, telecopy and e-mail with exchange of original signatures by overnight mail. To the extent permitted by Law and GAAP, for Tax and accounting purposes, the parties shall treat the Closing as being effective as of 11:59 p.m. on the Closing Date.

**9.    CLOSING DOCUMENTS**

9.1    <u>Closing Documents to be Delivered by Company and the Sellers</u>. On the Closing Date, Company and the Sellers shall deliver to Buyer:

(a)    certificates representing the Stock, duly endorsed or accompanied by stock powers duly executed in blank and otherwise in form acceptable for transfer on the books of Company;

(b)    the stock book, stock ledger, minute book and corporate seal of Company;

(c)    copies of resolutions of Company's Board of Directors authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and of Company's Articles of Incorporation and Bylaws, as amended, certified by Company's corporate secretary;

(d)    a certificate executed by Company and each of the Sellers attesting that Company and each of the Sellers has complied with all conditions set forth in Section 6 hereof or indicating with specificity any respects in which those conditions have not been complied with, in a form reasonably satisfactory to Buyer;

(e)    the consents, Permits, waivers, approvals and notices contemplated by Section 6.4 hereof;

(f)    an executed cross-receipt executed by each Seller, in a form reasonably satisfactory to Buyer and the Sellers;

(g)    an IRS Form W-9, completed by each Seller, in a form reasonably satisfactory to Buyer;

(h)    certificates from the State of Maryland and from each jurisdiction where Company is qualified to do business as a foreign corporation, dated no earlier than thirty (30) days prior to the Closing Date, as to the good standing of Company in such jurisdictions;

(i)    an affidavit of non-foreign status of each of the Sellers dated as of the Closing Date in form and substance required under Section 1445 of the Code and the regulations thereunder such that Buyer is exempt from withholding any portion of the Purchase Price;

(j)    the Non-Competition Agreements executed by Company, the Sellers and the officers and other key employees of Company as set forth in Section 6.9;

(k)    evidence of the payment of all Indebtedness and the release of all Liens other than Permitted Liens;

(l)    the mutual releases of Company and the Sellers executed by the Sellers as set forth in Section 5.14; and

(m)    an opinion of counsel to each Seller and Company, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer.

9.2   Closing Documents to be Delivered by Buyer.  On the Closing Date, Buyer shall deliver to Company and Sellers:

(a)   the Closing Purchase Price Payment, by delivery of the Closing Promissory Notes as set forth in Section 2.2(a);

(b)   certified copies of resolutions of Buyer's Board of Directors authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and of Buyer's Certificate of Incorporation and Bylaws, as amended, certified by Buyer's corporate secretary;

(c)   an executed cross-receipt, in a form reasonably satisfactory to Buyer and Sellers;

(d)   a certificate executed by Buyer attesting that Buyer has complied with all conditions set forth in Section 7 or indicating with specificity any respects in which those conditions have not been complied with, in a form reasonably satisfactory to Sellers;

(e)   an opinion of counsel to Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to the Sellers; and

(f)   the mutual releases of Company and the Sellers executed by Company as set forth in Section 5.14.

9.3   Other Closing Documents.  The parties will also execute such other documents and perform such other acts, before and after the Closing Date, as may be necessary for the implementation and consummation of this Agreement.

## 10.   TERMINATION; REMEDIES

10.1   Termination.  This Agreement may be terminated at any time prior to the Closing Date:

(a)   by mutual written agreement of the Sellers Representative and Buyer;

(b)   by the Sellers Representative, if the Closing shall not have occurred by October 31, 2006, and such failure is due to a failure of Buyer to fulfill the conditions set forth in Section 7 or a default by Buyer hereunder, so long as neither Company nor any Seller is in material breach hereunder;

(c)   by Buyer, if the Closing shall not have occurred by October 31, 2006, and such failure is due to a failure of Company or any of the Sellers to fulfill the conditions set forth in Section 6 or a default by Company or any of the Sellers hereunder, so long as Buyer is not in material breach hereunder;

10176897.8

47

(d)    by Buyer, if any of the Sellers or Company have committed a material breach of any provision of this Agreement that has not been cured within twenty (20) days of written notice of such material breach;

(e)    by the Sellers Representative, if Buyer has committed a material breach of any provision of this Agreement that has not been cured within twenty (20) days of written notice of such material breach;

(f)    by Buyer in accordance with Section 6.12; or

(g)    as provided in Section 10.3.

10.2    Effect of Termination.  If this Agreement is terminated as provided in Section 10.1, then, except as provided in this Section 10.2, Section 10.3 and in Section 10.4, all further obligations under this Agreement shall terminate and no party hereto shall have any liability in respect of the termination of this Agreement; provided, however, that the confidentiality obligations of Buyer, the Sellers and Company described in Section 5.8 will survive any such termination, and provided, further that, except as provided in Section 10.4, no such termination will relieve Buyer, the Sellers or Company from liability for any willful breach of any representation, warranty, covenant or agreement set forth in this Agreement prior to such termination and in the event of such breach the parties hereto shall be entitled to exercise any and all remedies available under law or equity in accordance with this Agreement.

10.3    Termination Due to Closing Promissory Note Non-Payment.  In the event that the obligations of Buyer under any of the four of the Closing Promissory Notes are not paid or otherwise satisfied in full within two (2) calendar days immediately following the Maturity Date (as defined in the Closing Promissory Notes), (a "Closing Promissory Note Non-Payment") then:

(a)    this Agreement shall terminate, and all rights and obligations of the parties hereunder (other than pursuant to Section 5.8, this Section 10.3 and Section 10.4) shall terminate without any liability of any party to any other party;

(b)    each of the other Transaction Documents (including, but not limited to, any agreement, certificate or other document executed by the parties in connection with the Closing) shall terminate and be null and void, and all rights and obligations of the parties thereunder shall terminate without any liability of any party thereto to any other party thereto;

(c)    each of the stock certificates representing the Shares, together with the stock powers related thereto, delivered by the Sellers to Buyer at Closing pursuant to Section 9.1(a) shall be immediately returned to the Sellers;

(d)    the stock book, stock ledger, minute books and corporate seal of Company, delivered by the Sellers to Buyer at Closing pursuant to Section 9.1(b) shall be returned to the Sellers; and

10176897.8

(e)    each party agrees to execute upon request all instruments, agreements, certificates and other documents otherwise reasonably necessary to carry out the intent of this Section 10.3.

For purposes of this Agreement, the actions to be taken pursuant to this Section 10.3 above shall be referred to as the "Unwinding Actions."

10.4    Termination Fee

(a)    If this Agreement is terminated by the Sellers Representative pursuant to Section 10.1(b), then Parent and Buyer shall pay, or cause to be paid, to the Sellers, at the time of such termination, an amount (the "Termination Fee") equal to One Million Dollars ($1,000,000.00) as liquidated damages. The parties expressly acknowledge and agree that, in light of the difficulty of accurately determining actual damages with respect to the foregoing upon such termination of this Agreement in circumstances where the Termination Fee is payable in accordance with this Section 10.4, the rights to payments under this Section 10.4: (i) constitute a reasonable estimate of the damages that will be suffered by reason of any such termination of this Agreement and (ii) shall be in full and complete satisfaction of any and all damages arising as a result of the foregoing. Each of the parties hereto acknowledges that the agreements contained in this Section 10.4 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the other parties hereto would not enter into this Agreement.

(b)    If this Agreement is terminated pursuant to Section 10.3, in addition to the remedies set forth in Section 10.3, Parent and Buyer shall pay to the Sellers, at the time of termination due to a Closing Promissory Note Non-Payment, the Termination Fee.

11.    INDEMNIFICATION

11.1    Survival of Representations and Warranties. All representations and warranties contained in this Agreement shall be deemed continuing representations and warranties, and together with the covenants contained herein (to the extent such covenants apply to periods prior to the Closing Date), shall survive the Closing Date for a period of twelve (12) months after the Closing Date (the "Survival Period"); provided, however, that any claim for indemnification made by Buyer under this Section 11 as a result of Company's or the Sellers' breach of any of the representations or warranties made by Company or the Sellers in (x) Sections 3.2, 3.3, 3.4 and 3.31, shall survive indefinitely and (y) Sections 3.6, 3.17, 3.19, 3.21 and 3.32 shall survive for sixty (60) days after the expiration date of the applicable statute of limitations (including any extensions thereof) for any Tax claims; and provided, further that any claim for indemnification made by the Sellers as a result of Buyer's breach of any of its representations and warranties made in Sections 4.2 and 4.10 shall survive indefinitely. Except for the foregoing, no claim for indemnification may be made under this Section 11 after the expiration of the Survival Period. Any investigations by or on behalf of a party hereto shall not constitute a waiver of such party's right to enforce any representation or warranty by the other party contained herein.

10176897.8

49

11.2    <u>Indemnification by Company and the Sellers</u>.  Subject to <u>Section 11.5</u> and except as otherwise provided in this <u>Section 11.2</u>, Company (but only prior to the Closing) and the Sellers shall jointly and severally indemnify and hold Buyer harmless against and with respect to, and shall reimburse Buyer for:

(a)    Any and all losses, liabilities, or damages resulting from any untrue representation, breach of warranty, or nonfulfillment of any unwaived covenants by Company or the Sellers contained herein or in any certificate delivered to Buyer hereunder, other than nonfulfillment of any covenants by Company after the Closing Date; <u>provided</u>, however, that each Seller shall be severally, and not jointly, liable to indemnify Buyer and pay its reasonable costs and expenses pursuant to <u>Section 11.2(c)</u> for any breach by such Seller of its representations and warranties made in <u>Sections 3.2(a)</u>, <u>3.3</u> and <u>3.5</u>;

(b)    Any and all losses, liabilities or damages arising out of, relating to, in the nature of or caused by any liability of Company for any Taxes with respect to any Tax year or portion thereof through and including the Closing Date (including any Taxes imposed under Code Section 1374 in excess of the Gross-Up Amount) (or for any Tax year beginning before and ending after the Closing Date to the extent allocable (determined in a manner consistent with <u>Section 5.16</u> to the portion of such period beginning before and ending on the Closing Date), to the extent such Taxes do not appear and are not included as a liability on the Closing Date Net Working Capital Statement; and

(c)    The reasonable costs and expenses (including reasonable legal fees and expenses) incurred by Buyer and its Affiliates of any and all actions, suits, proceedings, claims, demands, assessments, judgments, and investigations reasonably necessary to attempt to avoid the same or to oppose the imposition of any loss, liability or damage under <u>Sections 11.2(a)</u> and <u>11.2(b)</u>.

11.3    <u>Indemnification by Buyer</u>.  Buyer shall indemnify and hold the Sellers harmless against and with respect to, and shall reimburse the Sellers for:

(a)    Any and all losses, liabilities or damages resulting from any untrue representation, breach of warranty, or nonfulfillment of any covenants by Buyer contained herein or in any certificate delivered to the Sellers hereunder;

(b)    Except for those matters for which the Sellers have indemnified Buyer pursuant to <u>Section 11.2</u>, any and all losses, liabilities, or damages resulting from Buyer's or Company's operation of the Business after the Closing Date (including, without limitation, any obligation for Taxes with respect to any Tax year or portion thereof beginning after the Closing Date (or for any Tax year beginning before and ending after the Closing Date to the extent allocable (determined in a manner consistent with <u>Section 5.16</u>) to the portion of such period beginning on and ending after the Closing Date)); and

(c)    The reasonable costs and expenses (including reasonable legal fees and expenses) incurred by Company (if there is no Closing) and the Sellers of any and all actions, suits, proceedings, claims, demands, assessments, judgments, and investigations

reasonably necessary to attempt to avoid the same or to oppose the imposition of any loss, liability or damages under Sections 11.3(a) and 11.3(b).

      11.4   Procedures for Indemnification.  The procedures for indemnification shall be as follows:

      (a)   The party claiming indemnification (the "Indemnified Party") shall promptly give notice to the party from whom indemnification is claimed (the "Indemnifying Party") of any claim whether between the parties or brought by a third party against the Indemnified Party, specifying (i) the factual basis for such claim, and (ii) the amount of the claim.  If a claim relates to an action, suit, or proceeding filed by a third party against the Indemnified Party, such notice shall be given by the Indemnified Party to the Indemnifying Party promptly but in any event within fifteen (15) days after written notice of such action, suit, or proceeding shall have been given to the Indemnified Party.  Failure to give prompt notice shall not affect the indemnification obligations hereunder in the absence of actual prejudice.

      (b)   Following receipt of notice from the Indemnified Party of a claim, the Indemnifying Party shall have thirty (30) days in which to make such investigation of the claim as the Indemnifying Party shall deem necessary or desirable.  For the purposes of such investigation, the Indemnified Party agrees to make available to the Indemnifying Party and/or its authorized representative(s) the information relied upon by the Indemnified Party to substantiate the claim.  If the Indemnified Party and the Indemnifying Party agree at or prior to the expiration of said thirty (30) day period (or any agreed upon extension thereof) to the validity and amount of such claim, or if the Indemnifying Party does not respond to such notice, the Indemnifying Party shall immediately pay to the Indemnified Party the full amount of the claim; provided, that the Initial Holdback Amount shall be used to satisfy any Seller Indemnification Obligations until such amount is exhausted (if it is).  In the event the parties are unable to agree, either party may bring a legal action or proceeding to resolve such dispute.

      (c)   With respect to any claim by a third party as to which both parties have agreed that the Indemnified Party is entitled to indemnification hereunder, the Indemnifying Party shall have the right at its own expense to participate in or, if it so elects, to assume control of the defense of such claim, and the Indemnified Party shall cooperate fully with the Indemnifying Party, subject to reimbursement for reasonable actual out-of-pocket expense incurred by the Indemnified Party as the result of a request by the Indemnifying Party to so cooperate.  If the Indemnifying Party elects to assume control of the defense of any third-party claim, the Indemnified Party shall have the right to participate in the defense of such claim at its own expense.  The Indemnifying Party shall not, without the prior written consent of the Indemnified Party (such consent not to be unreasonably delayed, withheld or conditioned), settle, compromise or offer to settle or compromise any such claim or demand on a basis which would result in the imposition of a consent order, injunction or decree which would restrict the future activity or conduct of the Indemnified Party or any subsidiary or affiliate thereof or if such settlement or compromise does not include an unconditional release of the Indemnified Party for any liability arising out of such claim or demand or any related claim or demand.

10176897.8

(d)    If a claim, whether between the parties or by a third party, requires immediate action, the parties will make all reasonable efforts to reach a decision with respect thereto as expeditiously as possible.

(e)    If the Indemnifying Party does not elect to assume control or otherwise participate in the defense of any third-party claim, the Indemnifying Party shall be bound by the results obtained in good faith by the Indemnified Party with respect to such claim.

(f)    The indemnification rights provided in Sections 11.2 and 11.3 shall extend to the shareholders, directors, officers and Affiliates of the Indemnified Party, although for the purpose of the procedures set forth in this Section 11.4, any indemnification claims by such parties shall be made by and through the Indemnified Party.

(g)    Any Seller Indemnification Obligation shall be satisfied from the Initial Holdback Amount prior to Buyer exercising any other remedy, offset or action to seek recovery of amounts payable pursuant to the Seller's obligations under this Section 11.

11.5    Limitations on Indemnification.  Notwithstanding any other provision of this Agreement:

(a)    Other than with respect to any indemnification claim made with respect to any breach of the representations and warranties contained in Sections 3.2, 3.3, 3.4, or 3.31, the Sellers shall not have any indemnification payment obligations with respect to any breach of a representation or warranty under this Section 11 unless and until the aggregate amount of losses, liabilities, damages, costs or expenses of any kind under Section 11.2 with respect to any breach of representation or warranty exceeds Five Hundred Thousand Dollars ($500,000); provided, that once the aggregate amount of such losses, liabilities, damages, costs or expenses exceeds $500,000, the Sellers shall be liable for all such losses, liabilities, damages, costs or expenses, only to the extent that the aggregate amount of such losses, liability, damages, costs or expenses exceeds $500,000.

(b)    Other than with respect to any indemnification claim made with respect to any breach of the representations and warranties contained in Sections 3.2, 3.3, 3.4, or 3.31, for which the indemnification obligations hereunder shall be limited to the Purchase Price, the Sellers shall not have any indemnification payment obligations with respect to any breach of a representation or warranty for losses, liabilities, damages, costs or expenses of any kind under Section 11.2 in excess of the amount that is twenty percent (20%) of the Purchase Price.

(c)    No Indemnifying Party shall be liable for any claim under this Section 11 that is in an amount less than Ten Thousand Dollars ($10,000).

(d)    On and after the Closing Date, the Sellers shall have no rights of contribution against Company with respect to any indemnification obligations hereunder.

11.6    Subrogation.  Upon making an indemnity payment pursuant to this Agreement, the Indemnifying Party will, to the extent of such payment, be subrogated to all rights of the Indemnified Party against any third party in respect of the damages to which the
10176897.8

payment related. Without limiting the generality of any other provision hereof, each such Indemnified Party and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above described subrogation rights.

11.7    Exclusive Remedies.  The remedies provided for in this Agreement and the Closing Promissory Notes shall be the sole and exclusive remedies of the parties and their respective officers, directors, employees, affiliates, agents, representatives, successors and assigns for any breach of or inaccuracy in any representation, warranty or covenant contained in this Agreement or any certificate delivered at Closing; provided, however, that nothing herein is intended to waive any claims for fraud or waive any equitable remedies to which a party may be entitled.

11.8    No Double Recovery; Use of Insurance.  Notwithstanding anything herein to the contrary, no party shall be entitled to indemnification or reimbursement under any provision of this Agreement for any amount to the extent such party or its Affiliate has been indemnified or reimbursed for such amount under any other provision of this Agreement or other any document executed in connection with this Agreement or otherwise. Furthermore, in the event any losses, liabilities or damages related to a claim by Buyer are covered by insurance, Buyer agrees to use commercially reasonable efforts to seek recovery under such insurance and Buyer shall not be entitled to recover from the Sellers (and shall refund amounts received up to the amount of indemnification actually received) with respect to such damages to the extent Buyer recovers the insurance payment specified in the policy.

11.9    Treatment of Indemnity Payments Between the Parties.  Unless otherwise required by applicable Law, all indemnification payments shall constitute adjustments to the Purchase Price for all Tax purposes, and no party shall take any position inconsistent with such characterization.

11.10    Mitigation.  Each party agrees to use reasonable efforts to mitigate any loss, liability or damage which forms the basis of a claim hereunder.

## 12.    POST CLOSING MATTERS

12.1    Books and Records.  Each party agrees that it will reasonably cooperate with and make available (or cause to be made available) to the other party, during normal business hours, all books and records, information and employees (without substantial disruption of employment) retained, remaining in existence or continuing to be employed after the Closing Date which are necessary or useful in connection with any Tax inquiry, audit, or dispute, any litigation or investigation or any other matter requiring any such books and records, information or employees for any reasonable business purpose (a "Permitted Use"). The party requesting any such books and records, information or employees shall bear all of the out-of-pocket costs and expenses reasonably incurred in connection with providing such books and records, information or employees. All information received pursuant to this Section 12.1 shall be kept confidential pursuant to Section 5.8 (which shall continue to apply to this extent following the Closing Date) by the party receiving it, except to the extent that disclosure is reasonably necessary in connection with any Permitted Use.

10176897.8

12.2 <u>Cooperation and Records Retention</u>. Company, the Sellers and Buyer each shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, audit, or other examination by any taxing authority or judicial or administrative proceedings relating to liability for any Taxes; (ii) retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, proceeding or determination; (iii) provide the other with any final determination of any such audit or examination, proceeding, or determination that affects any amount required to be shown on any Tax Return of the other for any period; and (iv) cooperate with respect to closing the books of Company and filing a tax return for Company as of the Closing Date. The party requesting any such assistance or information shall bear all of the out-of-pocket costs and expenses reasonably incurred in connection with providing such assistance or information.

## 13.    EXPENSES

Except as otherwise expressly set forth elsewhere in this Agreement, Buyer shall bear its own legal and other fees and expenses incurred in connection with its negotiating, executing and performing this Agreement, including, without limitation, any related broker's or finder's fees and Company and the Sellers shall bear their respective legal and other fees and expenses incurred in connection with their negotiating, executing and performing this Agreement for periods on or before the Closing Date. The Sellers shall bear their own legal and other fees and expenses incurred in connection with this Agreement after the Closing, subject to the provisions of this Agreement. The Sellers shall bear all applicable stock transfer and similar Taxes, if any, which are required to be paid as a result of the sale and delivery to Buyer of the Stock in accordance herewith and, if required by applicable Law, shall cause all appropriate stock transfer tax stamps to be affixed to the certificates representing the Stock so sold and delivered hereunder.

## 14.    FURTHER ASSURANCES

From time to time at or after the Closing Date, at the request of the other, Buyer and the Sellers each will execute and deliver such other instruments of conveyance, assignment, transfer and delivery and take such actions as the other reasonably may request in order to consummate, complete and carry out the transactions contemplated hereby, including the execution and delivery of such instruments and agreements as may be reasonably necessary or advisable to fully effect the transfer of the Stock to Buyer.

## 15.    AMENDMENT; BENEFIT AND ASSIGNABILITY

This Agreement may be amended only be the execution and delivery of a written instrument by or on behalf of the Sellers and Buyer. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other person or entity shall have any right (whether third party beneficiary or otherwise) hereunder. This Agreement may not be assigned by any party without the prior written consent of the other party; <u>provided</u>, however, that Buyer may assign all or any portion of this Agreement or any right or obligation hereunder to any lender or other financing source and

any Affiliate of Buyer at any time prior to or after the Closing, provided that Buyer shall remain obligated for the payment of the Purchase Price and the performance of this Agreement.

**16.   NOTICES**

All notices demands and other communications pertaining to this Agreement ("Notices") shall be in writing addressed as follows:

> If to Company
> (prior to Closing):          Trawick & Associates
> 6900 Wisconsin Avenue
> Suite 400
> Bethesda, Maryland 20815
> Attention: Carol Trawick
> Facsimile: (301) 656-2251
>
> with a copy to:             Holland & Knight LLP
> 2099 Pennsylvania Avenue, N.W.
> Suite 100
> Washington, D.C. 20006
> Attention: William J. Mutryn, Esq.
> Facsimile: (202) 955-5564
>
> If to the Sellers
> to Sellers Representative:      Carol A. Trawick
> 6600 Elgin Lane
> Bethesda, Maryland 20817
> Facsimile: (301) 263-0527
>
> with a copy to:             Holland & Knight LLP
> 2099 Pennsylvania Avenue, N.W.
> Suite 100
> Washington, D.C. 20006
> Attn: William J. Mutryn, Esq.
> Facsimile: (202) 955-5564
>
> If to Buyer and Parent:       c/o Veritas Capital Fund
> Management, L.L.C.
> 590 Madison Avenue, 41st Floor
> New York, New York 10022
> Attention: Robert B. McKeon
> Facsimile: (212) 688-0020

10176897.8

with a copy to:                    Schulte Roth & Zabel LLP
                                   919 Third Avenue
                                   New York, New York, 10022
                                   Attention: Benjamin M. Polk, Esq.
                                   Facsimile: (212) 593-5595

Notices shall be deemed given (i) five (5) business days after being mailed by certified or registered United States mail, postage prepaid, return receipt requested, or (ii) on the first business day after being sent, prepaid, by nationally recognized overnight courier that issues a receipt or other confirmation of delivery or (iii) if delivered in person or telecopied (in a manner through which delivery may be verified) . Any party may change the address to which Notices under this Agreement are to be sent to it by giving written notice of a change of address in the manner provided in this Agreement for giving Notice.

### 17.   WAIVER

Unless otherwise specifically agreed in writing to the contrary: (i) the failure of any party at any time to require performance by the other of any provision of this Agreement shall not affect such party's right thereafter to enforce the same; (ii) no waiver by any party of any default by any other shall be valid unless in writing and acknowledged by an authorized representative of the non-defaulting party, and no such waiver shall be taken or held to be a waiver by such party of any other preceding or subsequent default; and (iii) no extension of time granted by any party for the performance of any obligation or act by any other party shall be deemed to be an extension of time for the performance of any other obligation or act hereunder.

### 18.   ENTIRE AGREEMENT

This Agreement and the Transaction Documents (including the Exhibits and Disclosure Schedules hereto, which are incorporated by reference herein) constitute the entire agreement between the parties with respect to the subject matter hereof and referenced herein, and supersede and terminate any prior agreements between the parties (written or oral) with respect to the subject matter hereof. This Agreement may not be altered or amended except by an instrument in writing signed by the party against whom enforcement of any such change is sought.

### 19.   COUNTERPARTS

This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument. Facsimiles of signatures shall be deemed to be originals.

### 20.   CONSTRUCTION

The headings of the Sections of this Agreement are for convenience only and in no way modify, interpret or construe the meaning of specific provisions of the Agreement.

10176897.8

21.    **EXHIBITS AND DISCLOSURE SCHEDULES**

The Exhibits and Disclosure Schedules to this Agreement are a material part of this Agreement.

22.    **SEVERABILITY**

In case any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions will not in any way be affected or impaired.  Any illegal or unenforceable term shall be deemed to be void and of no force and effect only to the minimum extent necessary to bring such term within the provisions of applicable Law and such term, as so modified, and the balance of this Agreement shall then be fully enforceable.

23.    **CHOICE OF LAW**

This Agreement is to be construed and governed by the laws of the State of New York. Buyer, Company and each Seller irrevocably agree that any legal action or proceeding arising out of or in connection with this Agreement may be brought in the courts of the State of New York located in the City of New York or the federal courts located in the Southern District of New York and each party agrees not to assert, by way of motion, as a defense, or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and hereby agrees not to challenge such jurisdiction or venue by reason of any offsets or counterclaims in any such action, suit or proceeding.

24.    **PUBLIC STATEMENTS**

None of Buyer, the Sellers or Company, without the prior written approval of the other party, shall make any press release or other public announcement concerning the transactions contemplated by this Agreement, except to the extent required by Law, in which case the other party shall be so advised as far in advance as possible and shall be given an opportunity to comment on such release or announcement.

25.    **COUNSEL**

Each party has been represented by its own counsel in connection with the negotiation and preparation of this Agreement and, consequently, each party hereby waives the application of any rule of law that would otherwise be applicable in connection with the interpretation of this Agreement, including, but not limited to, any rule of law to the effect that any provision of this Agreement shall be interpreted or construed against the party whose counsel drafted that provision.

## 26.    WAIVER OF TRIAL BY JURY

THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR RISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY IN CONNECTION WITH SUCH AGREEMENTS.

## 27.    SELLERS REPRESENTATIVE

27.1    Appointment of Sellers Representative. By the execution and delivery of this Agreement, each of the Sellers irrevocably constitute and appoint Carole A. Trawick as the true and lawful agent and attorney-in-fact of each Seller with full powers of substitution (if substituted, the Sellers Representative will promptly notify the Sellers of such substitution) to act in the name, place and stead of, and on behalf of and with respect to such Seller's interest in and with respect to this Agreement, as the same may be from time to time amended, and to do or refrain from doing all such acts and things, and to execute all such documents, as the Sellers Representative shall deem necessary or appropriate in connection with the foregoing matters. Each of the Sellers appointing the Sellers Representative hereunder hereby expressly acknowledges and agrees that the Sellers Representative is authorized to act on behalf of such Seller notwithstanding any dispute or disagreement among the Sellers. All decisions and actions of the Sellers Representative permitted hereunder shall be final, binding and conclusive on the Sellers and may be relied upon by Buyer and its Affiliates, as the decisions and actions of all of the Sellers. The appointment of the Sellers Representative shall be deemed coupled with an interest and shall be irrevocable, and any other person may conclusively and absolutely rely, without inquiry, upon any actions of the Sellers Representative as the acts of the Sellers in all matters referred to in this Agreement. The Sellers hereby ratify and confirm all acts that the Sellers Representative may do or cause to be done by virtue of such Sellers Representative's appointment as the Sellers Representative of such Sellers.

Without limiting the generality of the foregoing, the Sellers Representative is hereby authorized to take all actions on behalf of the Sellers in connection with any actions to be taken by the Sellers Representative including:

(a)    to agree upon or compromise any matter related to the calculation of any adjustment to the Purchase Price pursuant to Section 2.2 of this Agreement or otherwise or other payments to be made, including, without limitation, investigating, compromising or disputing any claims relating to the Net Working Capital Adjustments;

(b)    to act for such Sellers with respect to the Earn-Out Payments under Section 2.3 of this Agreement;

(c)    to approve the Tax Returns pursuant to Section 5 relating to Tax Returns for Company;

10176897.8

    (d)    to act for such Sellers with respect to all indemnification matters referred to in this Agreement, including the right to compromise on behalf of such Sellers any indemnification claim made by or against such Sellers;

    (e)    to terminate, amend, or waive any provision of the Agreement; provided that any such action, if material to the rights and obligations of such Sellers in the reasonable judgment of the Sellers Representative, shall be taken in the same manner with respect to all such Sellers, unless otherwise agreed to by each such Seller who is subject to any disparate treatment of a potentially adverse nature;

    (f)    to retain $100,000 of the Closing Purchase Price Payment as a reserve against the payment of expenses incurred in her capacity as Sellers Representative;

    (g)    employ and obtain the advice of legal counsel, accountants and other professional advisors as the Sellers Representative, in her sole discretion, deems necessary or advisable in the performance of her duties as the Sellers Representative and to rely on their advice and counsel; and incur and pay expenses, including fees of attorneys and accountants incurred pursuant to the transactions contemplated under this Agreement, and any other fees and expenses allocable or in any way relating to such transaction or any indemnification claim, whether incurred prior or subsequent to the Closing; and

    (h)    to do or refrain from doing any further act or deed on behalf of such Sellers which the Sellers Representative deems necessary or appropriate in her sole discretion relating to the subject matter of this Agreement as fully and completely as any of such Sellers could do if personally present and acting.

    27.2   Successor Sellers Representative.   In the event of the death or other incapacity of the then current Sellers Representative, or resignation of the Sellers Representative, then James R. Trawick shall be the successor Sellers Representative; provided, however, that if for any reason, James R. Trawick is unable or unwilling to serve as Sellers Representative, all of the Sellers who are parties to this Agreement, shall, by any writing executed by the holders of a majority of the shares of stock of Company immediately prior to the closing of the Agreement (counterparts and facsimiles of signatures acceptable) approve and appoint a new Sellers Representative by delivering a written notice to that effect to Buyer, whereupon the person designated in such notice shall be the new Sellers Representative with respect to all actions taken and/or documents signed from and after the date of such appointment. If for any reason no successor has been appointed within thirty (30) days, then any such Seller shall have the right to petition a court of competent jurisdiction for appointment of a successor Sellers Representative.

    27.3   Sellers Representative Fund; Excess Expenses.

    (a)    The Sellers agree that the Sellers Representative shall receive from the Closing Purchase Price Payment the amount of $100,000 (the "Sellers Representative Fund"), which she will retain in an escrow account as a reserve against the payment of actual out of pocket expenses incurred in her capacity as Sellers Representative. The Sellers Representative will serve without pay but may be reimbursed for out of pocket expenses.

10176897.8

59

(b)    In the event the Sellers Representative incurs expenses or liabilities in connection with this Agreement in excess of $100,000, the Sellers Representative is authorized to receive reimbursement for expenses or liabilities in excess of $100,000 by requiring each Seller to pay his or her Pro-Rata Share of such expenses or liabilities. Each Seller agrees to make such payment upon receipt of notice from the Sellers Representative requesting such payment.

(c)    At such time as the Sellers Representative reasonably determines that she has performed all covenants and agreements under, and taken all acts necessary with respect to this Agreement, and paid all expenses incurred by her in connection therewith, the Sellers Representative shall pay to each Seller his or her Pro-Rata Share of the Sellers Representative Fund remaining in the escrow account.

27.4    <u>Standard of Care; Indemnity by Sellers.</u> The Sellers Representative shall act for the Sellers on all of the matters set forth in this Agreement in the manner the Sellers Representative reasonably believes to be in the best interest of the Sellers , but the Sellers Representative shall not be responsible to any Seller for any loss or damage any Seller may suffer by reason of the performance by the Sellers Representative of such Sellers Representative's duties under this Agreement, other than loss or damage arising from bad faith, gross negligence or willful misconduct in the performance of such Sellers Representative's duties under this Agreement. The Sellers Representative shall not be liable to any of the Sellers for any act done or omitted by her in good faith pursuant to this Agreement including any mistake of fact or law. The Sellers do hereby severally agree to indemnify and hold the Sellers Representative harmless from and against any and all liability, loss, cost, damage or expense (including without limitation attorneys' fees) reasonably incurred or suffered as a result of the performance of such Sellers Representative's duties under this Agreement except for any such liability arising out of the bad faith, gross negligence or willful misconduct of the Sellers Representative. In taking any action or refraining from taking any action whatsoever the Sellers Representative shall be protected in relying upon any notice, paper or other document reasonably believed by her to be genuine, or upon any evidence reasonably deemed by her to be sufficient. The Sellers Representative may consult with counsel in connection with her duties and shall be fully protected in any act taken, suffered or permitted by her in good faith in accordance with the advice of counsel.

10176897.8

60

IN WITNESS WHEREOF, the parties have executed this Stock Purchase Agreement as of the date first written above.

T&A HOLDING CORP.

By: _____
Name: Robert B. McKeon
Title: President

T.R. SYSTEMS, INC.

By: _____
Name: Carol A. Trawick
Title: Chief Executive Officer and Treasurer

SELLERS

_____
Carol A. Trawick

_____
James R. Trawick

_____
Mark E. Kleckner

_____
Gary H. Brown

Solely for purposes of Section 10.4:
THE VERITAS CAPITAL FUND II, L.P.
By: Veritas Capital Management II, L.L.C.
    Its General Partner

By: _____
Name: Robert B. McKeon
Title: Authorized Signatory

**IN WITNESS WHEREOF,** the parties have executed this Stock Purchase Agreement as of the date first written above.

**T&A HOLDING CORP.**

By: _____
Name:  Robert B. McKeon
Title:    President

**T.R. SYSTEMS, INC.**

By: _____
Name:  Carol A. Trawick
Title:    Chief Executive Officer and Treasurer

**SELLERS**

_____
Carol A. Trawick

_____
James R. Trawick

_____
Mark E. Kleckner

_____
Gary H. Brown

**Solely for purposes of Section 10.4:**
**THE VERITAS CAPITAL FUND II, L.P.**
By:  Veritas Capital Management II, L.L.C.
        Its General Partner

By:_____
Name:  Robert B. McKeon
Title:    Authorized Signatory

Signing Execution Copy

## DISCLOSURE SCHEDULES

These disclosure schedules and all attachments hereto (each of which is incorporated herein by this reference) constitutes the "Disclosure Schedules" to the Stock Purchase Agreement, dated as of August 28, 2006 (the "Agreement"), by and among (i) T&A Holding Corp., a Delaware corporation (the "Buyer"), (ii) T.R. Systems, Inc., a Maryland corporation d/b/a Trawick & Associates (the "Company"), (iii) Carol A. Trawick, James R. Trawick, Mark E. Kleckner, and Gary H. Brown (each, a "Seller" and collectively, the "Sellers"), and, solely for purposes of Section 10.4 of the Agreement, The Veritas Capital Fund II L.P., a Delaware limited partnership (the "Parent").

Unless the context otherwise requires, or as otherwise defined in these Disclosure Schedules, all capitalized terms used in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement. No reference to or disclosure of any item or other matter in these Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. Certain agreements and other matters are listed in the Disclosure Schedules for informational purposes only, notwithstanding the fact that, because they do not rise above applicable materiality thresholds or otherwise, they are not required to be listed by the terms of the Agreement. Except as expressly provided in the representations and warranties to which any Disclosure Schedule relates, no reference to or listing of any agreement or document in these Disclosure Schedules shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Summaries of any written document herein do not purport to be complete and are qualified in their entirety by the document itself.

These Disclosure Schedules and the information and disclosures contained herein are intended only to list those items required to be listed in the Sections of the Agreement corresponding to the number of the schedule, and to qualify and limit the representations, warranties and covenants of the Company and the Sellers contained in the Agreement, and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. Notwithstanding anything to the contrary contained in these Disclosure Schedules or in the Agreement, the information and disclosures contained in each section of these Disclosure Schedules shall be deemed to be disclosed and incorporated by reference in each of the other sections of these Disclosure Schedules as though fully set forth in such other sections if specific cross references are made or if such disclosure and incorporation by reference is reasonably apparent to a third party. Headings have been inserted in the Schedules for reference only and do not amend the descriptions of the disclosed items set forth in the Agreement.

The information contained in the Schedules is confidential and proprietary information of the Company and Sellers and subject to the terms of Section 5.8 of the Agreement.